**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MMA Consultants 1, Inc.,

                     Plaintiff,

       v.                               No. 15-cv-5551

The Republic of Peru,

                     Defendant.

## MEMORANDUM OF LAW IN SUPPORT OF THE REPUBLIC OF PERU'S MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ..............................................................................2

    A.    Historical Context ............................................................. 2

    B.    The Underlying Contract And Related Certificates.................................. 2

    C.    The Arbitral Award on the Certificates and Underlying Debt.............................. 6

    D.    Subsequent Peruvian Debt Law .................................................... 8

    E.    The Certificates and the Complaint ................................................ 8

ARGUMENT ............................................................................................9

I.    PERU IS IMMUNE FROM JURISDICTION UNDER THE FSIA .......................................9

    A.    The FSIA Commercial Activity Exception Is Inapplicable .................................. 10

II.    IF A CONTRACT CLAIM EXISTED IT WOULD BE TIME-BARRED..........................12

    A.    Plaintiff's Claim Is Barred By New York's Six Year Statute of Limitations....... 12

    B.    The Complaint States No Plausible Claim Under Rule 12(b)(6)......................... 14

III.    THE COMPLAINT IS BARRED BY COLLATERAL ESTOPPEL .................................15

    A.    The Peru-GCC Award Meets the Prerequisites for Collateral Estoppel............... 16

    B.    Preclusive Effect Would Further The Policies Behind Collateral Estoppel ......... 20

IV.    PLAINTIFF'S CLAIM IS BARRED BY THE ACT OF STATE DOCTRINE .................21

    A.    Internal Peruvian Debt Was Extinguished Under Peruvian Law......................... 21

CONCLUSION...........................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Antares Aircraft, L.P. v. Federal Republic of Nigeria,
948 F.2d 90 (2d Cir. 1991),
vacated, 505 U.S. 1215 (1992),
affirmed 999 F.2d 33 (2d Cir. 1993) .................................................................................10

Argentine Republic v. Amerada Hess Shipping Corp.,
488 U.S. 428 (1989) ..........................................................................................................9

Ashcroft v. Iqbal,
556 U.S. 662 (2009) ........................................................................................................14

Banco Nacional de Cuba v. Sabbatino,
376 U.S. 398 (1964) ........................................................................................................21

Bear, Stearns & Co. v. 1109580 Ontario, Inc.,
409 F.3d 87 (2d Cir. 2005) .............................................................................................16

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007) ..................................................................................................14, 15

Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,
56 F.3d 359 (2d Cir. 1995) ........................................................................................16, 17

Charles Schwab & Co. v. Retrophin, Inc.,
2015 U.S. Dist. LEXIS 133535 (S.D.N.Y. Sept. 30, 2015) ..............................................2

Christopher D. Smithers Foundation, Inc. v. St. Luke's-Roosevelt Hosp. Center,
No. 00-cv-5501 (WHP), 2003 WL 115234 (S.D.N.Y. Jan. 13, 2003) .........................19, 20

Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq,
79 F. Supp. 2d 374 (S.D.N.Y. 2000) ...........................................................................11, 12

Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc.,
810 F.3d 861 (2d Cir. 2015) ...........................................................................................13

Eatoni Ergonomics, Inc. v. Research in Motion Corp.,
486 F. App'x 186 (2d Cir. 2012) ....................................................................................16

Effie Film, LLC v. Pomerance,
909 F.Supp. 2d 273 (2012) ...............................................................................................2

Emilio v. Sprint Spectrum L.P.,
68 F. Supp. 3d 509 (S.D.N.Y. 2014) ...........................................................................18, 20

Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.,
    809 F.3d 737 (2d Cir. 2016)................................................................21, 22

Giraldo v. Kessler,
    694 F.3d 161 (2d Cir. 2012)..................................................................2, 3

Guilbert v. Gardner,
    480 F.3d 140 (2d Cir. 2007)....................................................................13

Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co.,
    18 N.Y.3d 765 (2012) ............................................................................13

Homeward Residential, Inc. v. Sand Canyon Corp.,
    298 F.R.D. 116 (S.D.N.Y. 2014) .............................................................3

In re Drexel Burnham Lambert Grp., Inc.,
    161 B.R. 902 (S.D.N.Y. 1993)................................................................16

In re Merrill Lynch & Co.,
    273 F. Supp. 2d 351 (S.D.N.Y. 2003),
    aff'd, 396 F.3d 161 (2d Cir.),
    cert. denied, 126 S. Ct. 421 (2005) .........................................................15

Knapp v. Greene,
    29 N.Y.S.2d 854 (N.Y. App. Div. 1894) ...............................................14

Lazer Elec. Corp. v. Cecchi,
    141 F.3d 1151 (2d Cir. 1998)..................................................................18

Lehman XS Trust, Series 2006-4N v. GreenPoint Mortg. Funding,
    991 F. Supp. 2d 472 (S.D.N.Y. 2014)....................................................13

Lobaito v. Fin. Indus. Regulatory Auth., Inc.,
    No. 13-cv-6011 (GBD) (HBP), 2014 WL 4470423 (S.D.N.Y. Sept. 9, 2014).......................16

Montana v. United States,
    440 U.S. 970 (1979)..........................................................................18, 20

Morris v. People's Republic of China,
    478 F. Supp. 2d 561 (S.D.N.Y. 2007)..............................................10, 11, 12, 13

Mundaca Inv. Corp. v. Rivizzigno,
    247 A.D.2d 904 (N.Y. App. Div. 1998) .................................................14

Norris v. Grosvenor Marketing Ltd.,
    803 F.2d 1281 (2d Cir. 1986)..................................................................18

P.A. Props. v. B.S. Moss' Criterion Ctr. Corp.,
   No. 02-cv-4900 (LTS) (THK), 2004 U.S. Dist. LEXIS 25623 (S.D.N.Y. Dec.
   23, 2004) ...............................................................................................................3

Postlewaite v. McGraw-Hill, Inc.,
   333 F.3d 42 (2d Cir. 2003)..................................................................................19

Purjes v. Plausteiner,
   No. 15-CV-2515 (VEC), 2016 U.S. Dist. LEXIS 16345 (S.D.N.Y. Feb. 10,
   2016) .....................................................................................................................2

Republic of Argentina v. Weltover,
   504 U.S. 607 (1992)............................................................................................10

Robinson v. Gov't of Malaysia,
   269 F.3d 133 (2d Cir. 2001)..................................................................................9

Rogers v. Petroleo Brasileiro, S.A.,
   673 F.3d 131 (2d Cir. 2012)..........................................................................11, 15

Rosenthal v. Nierenberg,
   No.09-cv-8237 (NRB), 2010 WL 3290994 (S.D.N.Y. Aug. 10, 2010).......................16, 19, 20

Saudi Arabia v. Nelson,
   507 U.S. 349 (1993)..............................................................................................9

Turner v. Temptu Inc.,
   N. 11-cv-4144 (JMF), 2013 WL 4083234 (S.D.N.Y. Aug. 13, 2013)...................15

Underhill v. Hernandez,
   168 U.S. 250 (1897)............................................................................................21

Vigilant Ins. Co. v. Hous. Auth.,
   87 N.Y.2d 36 (1995) ...........................................................................................13

## STATUTES AND RULES

28 U.S.C. § 1604...............................................................................................................9

28 U.S.C. § 1605..........................................................................................................9, 10

C.P.L.R. § 206.................................................................................................................13

C.P.L.R. § 212.................................................................................................................12

C.P.L.R. § 213.................................................................................................................12

Fed. R. Evid. 201 ...........................................................................................................15

Fed. R. Civ. P. 12(b)(1) .................................................................................1

Fed. R. Civ. P. 12(b)(6) ..............................................................1, 3, 14, 15

Foreign Sovereign Immunities Act, 28 U.S.C. § 1602-11 ("FSIA")........................1, 9, 10, 11, 12

Defendant The Republic of Peru ("Defendant" or "Peru") submits this memorandum of law in support of its motion to dismiss the Complaint ("Complaint" or "Compl.") filed by Plaintiff MMA Consultants 1, Inc. ("MMA") under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff's attempt to win the lottery with 140 year-old defunct Certifications of Indebtedness (the "Certificates") should be rejected as frivolous. More than 140 years after any default could have occurred on 14 alleged Peruvian government Certificates, MMA nonetheless seeks damages from Peru for the nonpayment of the Certificates. As discussed below, it is a matter of public record that the Certificates were never validly issued in the United States—and that Peru has repeatedly declared the Certificates worthless (and with respect to a debt paid long ago).

Plaintiff's claim fails as a matter of law for at least four reasons. *First*, Peru is immune from jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602-11 ("FSIA") because Peru never engaged in any commercial activity with regard to the Certificates in the United States. *Second*, not only does the Complaint fail to state a plausible claim, but any breach of contract claim expired long ago under New York's six-year statute of limitations. *Third*, this action is barred by the doctrine of collateral estoppel based on a 1901 arbitral award that resolved all issues relating to an underlying debt related to the Certificates. *Fourth*, this action is barred by the Act of State doctrine, based on a 1937 Peruvian law cancelling all debts that could have related to the issuance of the Certificates in 1875.

## STATEMENT OF FACTS

### A.     Historical Context

The Certificates arose out of an interesting historical period in the nineteenth century during which certain nations, including Peru, actively marketed bird guano, mined from rookeries, as a source of quicklime. This guano was the subject of a war in 1864-1866 between Spain and Peru, Chile, Ecuador, and Bolivia. Subsequently, Chile and Peru went to war over guano deposits in the "War of the Pacific."   During this conflict, control over Peru's guano deposits passed from Peru to Chile.[1]   See Peru-GCC Award, 15 Rep. Int'l Arbitral Awards 77, 79-80 (Chile-Fr. 1901), available at http://legal.un.org/riaa/cases/vol_XV/77-387.pdf (certified translations of excerpts attached as Exhibit A to the Declaration of Vanessa Soderberg ("Soderberg Decl.")).   Chile decided to sell the guano, but recognized the potential rights of Peru's creditors.   In 1883, Chile and Peru signed the Treaty of Ancón, which ended the War of the Pacific and established the framework for the creation of an arbitration process to resolve issues related to Peru's debt.   See Peru-GCC Award at 79, 128.

### B.     The Underlying Contract And Related Certificates

The Certificates originate from Peru's contractual relationship with a company called The Guano Consignment Company of the United States ("GCC").   The nature of this relationship is a matter of public record.   See generally Peru-GCC Award.

---

[1] The historical context is a matter of public record, having been relevant to a dispute and reported international arbitration decision (the "Peru-GCC Award"). See generally Peru-GCC Award.   This Court may take notice of the Peru-GCC Award, which is a matter of public record. Giraldo v. Kessler, 694 F.3d 161, 164 (2d Cir. 2012) ("We also take judicial notice of relevant matters of public record.") (citation omitted).   Courts routinely take notice of arbitral awards.   Purjes v. Plausteiner, No. 15-CV-2515 (VEC), 2016 U.S. Dist. LEXIS 16345, at *13 (S.D.N.Y. Feb. 10, 2016) (taking notice of filings in an arbitration proceeding); Charles Schwab & Co. v. Retrophin, Inc., 2015 U.S. Dist. LEXIS 133535, at *18-19 (S.D.N.Y. Sept. 30, 2015) (taking notice of an arbitral award in order to determine whether it had a preclusive effect).   The Court also may generally take notice of matters of historical fact. See Effie Film, LLC v. Pomerance, 909 F.Supp. 2d 273, 298 (2012) ("Rule 201 thus permits judicial notice of historical facts.") (citing Weinstein's Federal Evidence, §201.12[5] at 201-44).

GCC was a company incorporated in Peru in 1865, subject to Peruvian laws for the purpose of exporting guano to the United States.  See Peru-GCC Award at 150-51.  In 1865, Peru granted GCC a monopoly to export guano from Peru to the United States.  See Peru-GCC Award at 150, 336.

Subsequently, in 1875, Peru passed a law authorizing the free and direct sale of guano in the United States.   See id. at 155, 336.  Further to this law and for the purpose of settling a contract-related debt to GCC, Peru and GCC negotiated a new contract (mentioned on the face of the Certificates (the "Contract")).[2]  Id. at 155-58; see also Contract (certified translation attached as Exhibit B to Soderberg Decl.); Transcription (certified transcription of the terms on the face of the Certificates attached as Exhibit C to Soderberg Decl.).[3]   Under the Contract, GCC's monopoly over guano exports to the United States was eliminated and Peru recognized a debt to GCC of approximately four million Soles (the Peruvian currency at the time).  Contract, Art. 4; see also Peru-GCC Award at 156 (reproducing excerpts from the Contract).  The Contract further provided that Peru would issue the Certificates specifically for the purpose of settling its debt to GCC.

> By calculating at approximately four million Soles the balance that the Government will owe to [GCC] on current account, with the ten percent interest on the thirtieth of the current month, the Government undertakes to issue and to

---

[2] The Contract is referred to in the Certificates that were attached to the Complaint and is available in the Peruvian National Archives.  This Court may take judicial notice of the Contract as a publicly available document.  See Giraldo, 694 F.3d at 164; P.A. Props. v. B.S. Moss' Criterion Ctr. Corp., No. 02-cv-4900 (LTS) (THK), 2004 U.S. Dist. LEXIS 25623, at *35 (S.D.N.Y. Dec. 23, 2004) ("The court may take judicial notice of public documents and records, including those not specifically referenced in the complaint.").  The Contract is not central to this motion to dismiss, but is provided only as background and context, and confirms facts noted and articles of the Contract reproduced in the Peru-GCC Award.  A certified translation of the Contract is attached as Exhibit A to the Soderberg Declaration.

[3] The Certificates are attached to the Complaint and, therefore, may be considered by the Court on a Rule 12(b)(6) motion.  See Homeward Residential, Inc. v. Sand Canyon Corp., 298 F.R.D. 116, 122-23 (S.D.N.Y. 2014) ("On a 12(b)(6) motion to dismiss, a district court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, documents possessed by plaintiffs, or documents that plaintiffs knew about and relied upon.").

deliver to [GCC] debt certificates of one thousand dollars each, in United States Gold currency worth in nominal total three million six hundred thousand dollars, which at the rate of ninety percent will be brought to the Government on current account next May 1st.

Contract, Art. 4; <u>Peru-GCC Award</u> at 156.

Moreover, the Contract established the terms of the Certificates. In addition to providing terms as to interest and the amortization schedule of the Certificates, the Contract provided that Peru would deliver the Certificates to GCC, <u>which then specifically would not issue them on the public market</u>, but rather would hold the Certificates until the end of the redemption period in 1880. <u>See</u> Contract, Art. 18; <u>Peru-GCC Award</u> at 338. The Arbitration Tribunal (the "Tribunal") found that the Contract:

clearly shows, on the one hand that the Parties had contemplated the eventuality where the Company would underwrite the certificates on its own account, and on the other hand, <u>that the certificates were never delivered to the Company in place of payment . . . but only in order to allow it to seek its payment</u>. . . .

<u>Id.</u> (emphasis added).

Under the Contract, GCC retained the right to sell quantities of guano to service Peru's debt to GCC. Contract, Art. 2; <u>Peru-GCC Award</u> at 156. As a consequence, by 1880, the Contract anticipated that GCC would make enough from Peruvian guano concessions to recoup what it was owed. <u>See</u> Contract, Arts. 2, 9; <u>Peru-GCC Award</u> at 156-58, 338. Under the Contract, Peru's dealings with GCC were governed by Peruvian law and subject to the jurisdiction of Peruvian courts. Contract, Art. 19.

The Contract provided for the delivery of 3,600 Certificates, each valued at $1,000 and bearing interest at 7% per year, terms which also appear on the face of the Certificates themselves. <u>See</u> Transcription; Contract, Arts. 4-5. The Certificates provided for principal and interest to be paid by Hobson, Hurtado & Co., Peru's designated financial agents in New York.

See Transcription; Contract, Art. 6.  The Certificates also provided that they were to be redeemed in tranches once a year, every year, between 1876 and 1880, in response to publicly announced redemptions of Certificates randomly selected by Hobson, Hurtado & Co.  See Transcription; Contract, Arts. 5-6.  After 1880, interest would stop because all of the Certificates would have been redeemed and paid.  See Transcription; Contract, Art. 5.

There is no evidence that the Certificates were ever issued in New York.  In fact, all historical evidence is to the contrary.  The only public mention of the Certificates was a New York Herald article published in 1875 noting that Certificates *might* be issued, using future tense. Declaration of James H. Lide, dated April 4, 2016 ("Lide Decl.") ¶ 17 (the article is attached as Exhibit H to the Lide Decl.).  A survey of public archives from 1875 through the 1930s, and public secondary sources reveal no further mention of the Certificates ever again.  Id. ¶¶ 18-21. Indeed, a search of public records reveals that no newspaper notices regarding issuance or redemption of the Certificates were ever published, showing that the Certificates were not issued and redeemed in New York as per the terms of the Certificates.  Id. ¶¶ 10-17.  This was as opposed to other Peruvian bonds, which were the subject of announcements in the New York financial press.  Id. at ¶¶ 11-12, 14.  Furthermore, publicly available information indicates that Hobson, Hurtado & Co. went into bankruptcy in or around 1881, making it impossible for the Certificates to have been paid or redeemed through them.  Id. ¶ 23.[4]

Tellingly, the Complaint pleads no facts to show that the Certificates were ever validly issued or redeemed in New York.  Instead, MMA only quotes the face of the Certificates relating

---

[4] Further proof that the Certificates never were validly issued to the public are the records of the Foreign Bondholders Commission, a Depression-era creation of the Roosevelt administration that helped resolve bond defaults that had arisen in the years prior to the Depression, and the Council of Foreign Bondholders, a similar British organization.  Neither organization makes any mention of the Certificates as ever being issued or redeemed, or as having ever defaulted – although there are records of other Peruvian government bonds of that period.  Lide Decl. ¶ 18.

to issuance in New York, and that they were "payable" here. See Compl. ¶¶ 7-9. MMA cites no facts confirming that the Certificates were ever issued and redeemed here (and also ignores the Peru-GCC Award, which confirmed that the Certificates never left GCC's hands, as detailed below).

C.      The Arbitral Award on the Certificates and Underlying Debt

The fate of the Certificates was then determined in the Peru-GCC Award of 1901.[5] As established by the Tribunal, all of the Certificates were "issued by the Government of Peru to the Company" to guarantee the contractual debt. Peru-GCC Award at 337. As established by the Peru-GCC Award, the debt to GCC was in fact paid and GCC withheld the Certificates and "did not even try to establish that it had sought to put the certificates into circulation." Id. at 337. The Tribunal found that, under the Contract, a small portion of GCC's claim on Peru's debt still existed. Id. at 338.

Thus, the Tribunal recognized that the Certificates were not validly issued to the public, whether in New York by Hobson, Hurtado & Co., or in the United States, and were never redeemed. Id. at 336-38. Rather, GCC kept the Certificates, and on each redemption date from 1876-1880 was paid by Peru for a portion of the Certificates (plus a commission), as Peru and GCC had agreed in their Contract. Id. at 337-38. But, even after Peru paid the value corresponding to the face of the Certificates, GCC retained the Certificates and did not return them to Peru. Id. at 337. Indeed, significantly, the Tribunal found that *as of 1901*, GCC continued to hold the Certificates even though GCC had been obligated to return the Certificates

---

[5] In 1895, an international arbitration tribunal (the "Tribunal") was established to determine whether certain Peruvian creditors (including the GCC estate) could access certain funds from guano exports that Chile had set aside during the war based on its occupation of Peruvian territory. Peru-GCC Award at 79.

to Peru once Peru's debt had been discharged.[6]  Id.  Thus, the Certificates expired in GCC's hands, as of 1901, the Certificates were long since defunct, having never been issued or redeemed during their contractually-limited term.

By the time of the Peru-GCC Award, GCC had failed and gone into liquidation.  Peru-GCC Award at 158.  GCC's estate filed a claim seeking a portion of the Chilean guano funds.  Id.  at 139-40, 161.  In order to ascertain whether GCC had a valid claim, the Tribunal had to determine whether Peru's debts to GCC still existed.  See id. at 338.  In connection with that determination, Peru and the GCC estate litigated the facts surrounding the Certificates.  See Peru-GCC Award at 125 n.2, 136, 167-70; Peru's Intervention in the Arbitral Proceedings at 82-100,  available  at  https://books.google.com/books?id=wwY5AQAAIAAJ&printsec=front cover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false  (certified  translation  of excerpts from the Intervention is attached as Exhibit D to Soderberg Decl.) [hereinafter "Peru's Intervention"] (addressing  Peru's  intervention  in  the  proceedings  before  the  Tribunal  and presenting questions to be provided by the Government of Peru to the Tribunal).

In this context, the Tribunal recognized that (1) the Certificates were held by GCC and not validly issued to the public; (2) Peru made the scheduled payments on the Certificates; and (3) GCC was entitled to *some* funds.  Id. at 158, 337-38.  In fact, the Tribunal wrote, "[t]he 3,600 debt certificates provided for in Article 4 [of the Contract] were actually issued by the Government to the [GCC]. . . .  [GCC] kept the certificates for itself. [GCC] credited the Government first for the total amount, and then debited it successively, at each due date, the amount of depreciation that should have taken place, and the interest."  Id. at 158.

---

[6] Ultimately, the Tribunal ruled that GCC's estate was entitled to a small portion of the funds set aside by Chile based on all of GCC's dealing with Peru between 1865-1880.  Peru-GCC Award at 385-86.

Peru accepted the Peru-GCC Award of 1901, and, in 1907, ordered payment to GCC as "definitive cancellation of any remaining contractual debt once GCC turned over all 3,600 Certificates." Ministry of Finance and Commerce, Ordinary Congress of 1907, Annex No. 106 (certified translation attached as Exhibit E to Soderberg Decl.). There is no public record of GCC ever returning the physical Certificates to Peru.

### D. Subsequent Peruvian Debt Law

In 1937, Peru enacted Law No. 8599. Statute of Limitations on Government Debt, Law No. 8599 (1937) (certified translation attached as Exhibit F to Soderberg Decl.). Article 3 of Law No. 8599 established that "[t]he principal of *Internal Debt Bonds* which are not claimed by the interested parties shall expire in fifteen years, provided that the bondholders did not collect interest or engage in any act asserting their ownership of the bonds in that time." Id. (emphasis added). Thus, any debt instruments issued in Peru would be considered "expired" if not claimed for payment in 15 years (by 1952). Law No. 8599, Art. 1 ("Legal actions and claims related to debt owed by the State, regardless of their status, shall be considered to be expired or past the statute of limitations, whenever the interested party has let pass fifteen years without initiating or pursuing the course of their respective claim or case for repayment or recognition."). The Peru-GCC Award made clear that the Certificates were part of an internal Peruvian debt, having been given to GCC in Peru with regard to Peruvian obligations owed to GCC. Peru-GCC Award at 318. As such, any debt relating to GCC was finally extinguished (if still extant) as of 1952.

### E. The Certificates and the Complaint

MMA claims to hold 14 of the Certificates. Compl. ¶¶ 1, 2, 7, 10. Plaintiff does not plead how or when it came into possession of these Certificates, or how much it paid for them.

In filing the Complaint, MMA ignored the Peru-GCC Award, as well as publicly available historical evidence showing that the Certificates had never been validly issued in the

United States. The Complaint, while stating that Plaintiff contacted Peru in 2015 to demand payment (Compl. ¶¶ 11-13), fails to state that in 2012 Peru informed Plaintiff's counsel that the Certificates were void. Soderberg Decl. ¶ 9 (certified translation of the 2012 Letter attached as Exhibit G to Soderberg Decl.). Moreover, an unidentified holder of 13 of MMA's 14 certificates attempted in 2009 to demand payment and was told by Peru that the Certificates were invalid. Soderberg Decl. ¶ 10 (certified translation of the 2009 Letter attached as Exhibit H to Soderberg Decl.).[7] Notably, despite the overlapping 13 certificates, this 2009 correspondence makes no mention of MMA.

## ARGUMENT

### I. PERU IS IMMUNE FROM JURISDICTION UNDER THE FSIA

Under the Foreign Sovereign Immunities Act ("FSIA"), MMA cannot establish jurisdiction over Peru because it is a foreign sovereign state and no exception applies. The FSIA is the "sole basis for obtaining jurisdiction over a foreign state" in U.S. courts. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). The Complaint admits that Peru is a sovereign state. Compl. ¶ 3. Under the FSIA, Peru enjoys full immunity from suit unless an FSIA exception to immunity is shown by the plaintiff. 28 U.S.C. §§ 1604-05; Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993) ("a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies"); Argentine Republic, 488 U.S. at 434; Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 & n.7 (2d Cir. 2001) ("plaintiff has the burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity should not be granted, although the ultimate burden of persuasion

---

[7] MMA claims to hold numbers 467, 477, 496, 607, 612, 1835, 1859, 1884, 1885, 1886, 1887, 1889, 1890, and 1899. Compl. ¶¶ 2, 10. Of these 14, all but number 1859 were the subject of the previous demand, which Peru rejected in January 2009. The Complaint does not reveal whether Plaintiff or its counsel knew or should have known about that earlier demand.

remains with the alleged foreign sovereign.") (quotations omitted). Here, the Complaint provides no basis for an exception to immunity and, based on the Peru-GCC Award, no exception can be established.[8]

### A. The FSIA Commercial Activity Exception Is Inapplicable

As a case relating to a breach of contract on a bond, the only applicable exception to sovereign immunity would be the commercial activity exception of FSIA § 1605(a)(2). See Republic of Argentina v. Weltover, 504 U.S. 607, 611-12 (1992) (claim on sovereign bond). That section enumerates three types of commercial activity that may defeat sovereign immunity:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case . . . in which the action is based upon [1] a commercial activity carried on in the United States by the foreign state; or [2] an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory or the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States

28 U.S.C. § 1605(a)(2) (numbering added).

Plaintiff incorrectly relies on the first and third clauses of the commercial activity exception, based on allegations that the Certificates were (i) issued in New York; and (ii) not repaid in New York. Compl. ¶ 5, 8. Were either of those allegations true, then there might be a basis for jurisdiction under the FSIA. See Weltover, 504 U.S. at 620 (breach of bond issued and payable in New York gave rise to jurisdiction under FSIA).

But here, however, as the Peru-GCC Award establishes, the Certificates were never issued or redeemed in New York. Rather, as established by the Peru-GCC Award, Peru provided the Certificates to GCC in Peru *and GCC never validly issued them* in New York or anywhere

---

[8] Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991), vacated, 505 U.S. 1215 (1992), affirmed 999 F.2d 33 (2d Cir. 1993) (on a motion "challenging the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits"); Morris v. People's Republic of China, 478 F. Supp. 2d 561, 565 (S.D.N.Y. 2007) (to resolve subject matter jurisdiction, the "Court should look outside the pleadings to submissions by the parties").

else, and **as of 1901** the Certificates remained in GCC's hands (i.e., they still had not been issued, and were by that time long past expired by their terms). Peru-GCC Award at 337-38. As such, no debt or contractual obligation arose in New York, no obligation was breached in New York, and no failure to pay in New York ever occurred. Under those circumstances, no exception to immunity exists under the FSIA and this case must be dismissed. See Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq, 79 F. Supp. 2d 374, 382 (S.D.N.Y. 2000) (direct effect test was not satisfied where foreign state was under no contractual obligation to make payments to plaintiff in the United States).

The fact that the Certificates could have been payable in New York had they been issued is not a way around the FSIA. Rather, the test is whether "performance could have been required in the United States and then was requested there." Morris, 478 F. Supp. 2d at 570, n.13; see also Rogers v. Petroleo Brasileiro, S.A., 673 F.3d 131, 139 (2d Cir. 2012) ("In cases involving the default by a foreign state or its instrumentality on its commercial obligations, an act has a direct effect in the United States if the defaulting party is contractually obligated to pay in this country."). Here, performance never could have been required in New York because the Certificates were given to and expired in the hands of GCC in Peru. Hence, no contractual obligation ever arose in the United States that could serve as the basis of a loss here.

MMA has not pleaded the details of its acquisition of these defunct Certificates in the collectibles market or presented any evidence of any loss suffered relating in any way to a contract with Peru to repay these Certificates.[9] See Morris, 478 F. Supp. 2d at 567 ("As an initial matter, the Court questions whether the 1939 default on interest or the 1960 default on principal

---

[9] Certificates have been offered for sale on eBay. Soderberg Decl. Ex. I (screenshots of a Certificate available on eBay as of January 28, 2016). Cf. Soderberg Decl. Ex. J (SEC Litigation Release No. 15989 (Dec. 1, 1998), available at https://www.sec.gov/litigation/litreleases/lr15989.txt) (discussing SEC civil injunction preventing the sale of ancient bonds as anything other than collectibles); Soderberg Decl. Ex. K (SEC Litigation Release No. 18393 (Oct. 6, 2003) available at https://www.sec.gov/litigation/litreleases/lr18393 htm) (same).

had *any* effect on plaintiff who likely purchased the long-defaulted bonds for a few hundred dollars in a 'collectibles' market in 2000.").  As in Morris, if Plaintiff purchased its Certificates priced "as collectibles, and not as legitimate financial instruments, then it can hardly be considered a financial loss when he receives exactly what he paid for."  Id. at 568.

## II.    IF A CONTRACT CLAIM EXISTED IT WOULD BE TIME-BARRED

Even if a contract claim existed on the Certificates (and as explained below, it does not), that claim would be barred under New York's six-year statute of limitations.

### A.    Plaintiff's Claim Is Barred By New York's Six Year Statute of Limitations

MMA's claim is barred by New York's statute of limitations for breach of contract.  The FSIA looks to the forum state's law to determine whether Plaintiff's claim is time-barred. Morris, 478 F. Supp. 2d at 571; see also Dar El-Bina, 79 F. Supp. 2d at 388 ("Statutes of limitations are regarded as part of a forum's procedure.  In consequence, New York's law governs the determination of whether plaintiffs' claim is time barred.").  If the Certificates had been issued and were not paid in New York (which was the designated place of payment), then New York law would apply to the breach of contract claim, and New York has a six-year statute of limitations for breach of contract.  See N.Y. C.P.L.R. § 213(2); Morris, 478 F. Supp. at 571-72 (applying C.P.L.R. 212(2) to an action to recover on foreign sovereign bonds); Dar El-Bina, 79 F. Supp. 2d at 389 (same).

New York's six-year limitations period "generally runs from the time the contract was breached."  Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc., 810 F.3d 861, 865 (2d Cir. 2015); see also Guilbert v. Gardner, 480 F.3d 140, 149 (2d Cir. 2007) ("The plaintiff need not be aware of the breach of contract or wrong to start the period running."); Lehman XS Trust, Series 2006-4N v. GreenPoint Mortg. Funding, 991 F. Supp. 2d 472, 476 (S.D.N.Y. 2014) ("A breach

of contract claim accrues at the time of breach, even if plaintiff does not suffer damages until a later date.").

Two possible accrual dates apply to claims concerning a bond that, as here, provides for periodic interest payments as well as payment in full at maturity. The limitations period "begins to run 'on each [interest] installment from the date it becomes due' and on recovery of the principal from the day after the bond matures." See Morris 478 F. Supp. 2d at 571 (citing Vigilant Ins. Co. v. Hous. Auth., 87 N.Y.2d 36 (1995) (finding that the six-year limitations period would "begin to run on the day after maturity of the bonds")). "Where 'demand is necessary to entitle a person to commence an action,' a cause of action accrues 'when the right to make a demand is complete.'" Deutsche Bank Nat'l Trust Co. 810 F.3d at 9 (citing N.Y.C.P.L.R. § 206(a)). The period "runs from the time when the party making the demand first becomes [legally] entitled to make the demand, and not from the time the actual demand is made." Lehman, 991 F. Supp. 2d at 476 (citations omitted); Hahn Automotive Warehouse, Inc. v. American Zurich Ins. Co., 18 N.Y.3d 765, 771 (2012) ("A consistent line of Appellate Division precedent holds that, where 'the claim is for payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the [party making the claim] possesses a legal right to demand payment.'" (citations omitted)).

Even if the Certificates had been validly issued in New York (which they were not, as shown by the Peru-GCC Award), the last of the Certificates would have been due and payable in 1880. See Transcription (providing that principal shall be paid beginning in May 1876 through May 1880 "upon presentation and surrender . . . to the Financial Agents of Peru in New York"; interest accrued semi-annually beginning in 1875 and ceased from and after the date principal became payable; every year starting in 1876 and ending in 1880, a specific percentage of issued

Bond numbers were to be drawn by lot in New York City by Peru's Financial Agent, after which those Bond numbers would be published in newspapers announcing redemption in May of each year through 1880, when all the Certificates would have been redeemed).

Thus, any claim under the express terms of the Certificates would, at the latest, need to have been brought ***by January 1, 1887***, six years after the last of the Certificates matured and payment on the Certificates could be demanded (i.e., at the end of 1880). See Mundaca Inv. Corp. v. Rivizzigno, 247 A.D.2d 904, 906 (N.Y. App. Div. 1998) ("[A] cause of action accrues for the purpose of setting the [Statute of Limitations] in motion as soon as the creditor, by his own act and in spite of the debtor, can make the [note] payable.") (quoting Knapp v. Greene, 29 N.Y.S.2d 854, 855 (N.Y. App. Div. 1894)). Plaintiffs have missed that cut-off date by at least ***129 years***. Accordingly, the statute of limitations on any alleged default expired long ago.

### B.     The Complaint States No Plausible Claim Under Rule 12(b)(6)

MMA fails to state a plausible claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. To survive a motion to dismiss under Rule 12(b)(6), "[a] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To satisfy this standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Indeed, "[f]actual allegations must be enough to raise a right to relief above the speculative level. . . . " Id. at 555.[10]

---

[10] In deciding a Rule 12(b)(6) motion the Court may consider, among other things, "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (footnotes omitted), aff'd, 396 F.3d 161 (2d Cir.), cert. denied, 126 S. Ct. 421 (2005).

In order to state a claim of breach of contract, Plaintiff must allege: (i) the existence of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages suffered as a result of breach. Turner v. Temptu Inc., No. 11-cv-4144 (JMF), 2013 WL 4083234, at *8 (S.D.N.Y. Aug. 13, 2013). MMA does not allege the existence of a contractual relationship between MMA and the Peruvian State other than the 14 Certificates it allegedly possesses. Moreover, as a matter of public record (the Peru-GCC Award) the Certificates were never issued during their term, and as such, can give rise to no contractual rights. In addition, to the extent delivered to GCC in 1875, the Certificates expired by 1880, and the Peru-GCC Award establishes that GCC still held the Certificates as of 1901. By that date, the Bonds were invalid on their face—and the Peru-GCC Award found that GCC had never been paid. Either way, the Certificates cannot be used to state a plausible breach of contract claim. See, e.g., Rogers, 673 F.3d at 137 ("There being no obligation, [defendant] has no duty to honor an attempt by a Bondholder to convert, and a decision not to convert cannot be a breach, as the Bondholder is not deprived of any contractual right.").

## III. THE COMPLAINT IS BARRED BY COLLATERAL ESTOPPEL

The Peru-GCC Award precludes Plaintiff MMA from relitigating the issue of whether the Certificates are valid debt instruments. "Collateral estoppel, or issue preclusion, bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment." Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F.3d 359, 368 (2d Cir. 1995); see also Rosenthal v. Nierenberg, No.09-cv-8237 (NRB), 2010 WL 3290994, at *3 (S.D.N.Y. Aug. 10, 2010) ("Collateral estoppel (or issue preclusion) 'bars the relitigation of an issue that was raised, litigated, and actually decided by a judgment in a prior proceeding, regardless of whether the two suits are based on the same cause of action.'" (citation omitted)).

Moreover, collateral estoppel applies to arbitral decisions and arbitral awards and is applicable here. See, e.g., Eatoni Ergonomics, Inc. v. Research in Motion Corp., 486 F. App'x 186, 190 (2d Cir. 2012) (holding plaintiff's claim was properly dismissed where a previous arbitral decision satisfied the elements of collateral estoppel); Bear, Stearns & Co. v. 1109580 Ontario, Inc., 409 F.3d 87, 91 (2d Cir. 2005) ("An arbitration decision may effect collateral estoppel in a later litigation or arbitration if the proponent can show with clarity and certainty that the same issues were resolved." (internal quotation marks omitted)). That the Peru-GCC Award was not later confirmed in this Circuit does not impact whether it should be given preclusive effect. See Lobaito v. Fin. Indus. Regulatory Auth., Inc., No. 13-cv-6011 (GBD) (HBP), 2014 WL 4470423, at *12 (S.D.N.Y. Sept. 9, 2014) ("A collateral estoppel defense may be predicated on an arbitration award whether or not the award has been judicially confirmed."); In re Drexel Burnham Lambert Grp., Inc., 161 B.R. 902, 906-07 (S.D.N.Y. 1993) (finding that an argument "that an unconfirmed arbitration award necessarily has no preclusive effect . . . fails.").

Thus, the Peru-GCC Award should be given preclusive effect because final arbitral awards and decisions may have the same preclusive effect as final court decisions where (a) the traditional prerequisites for collateral estoppel are met, as they are here; and (b) giving the Award preclusive effect would further the policies behind the doctrine of collateral estoppel.

## A.     The Peru-GCC Award Meets the Prerequisites for Collateral Estoppel

The Peru-GCC Award has preclusive effect over whether there was a breach of contract "arising out of Peru's failure to pay fourteen (14) bearer bonds in Plaintiff's possession" (Compl. ¶ 1) because all of the traditional prerequisites for collateral estoppel are present. That is, (1) the issues must be the same, (2) the relevant issues were actually litigated and decided in the prior proceeding, (3) there was a "full and fair opportunity" for the litigation of the issues in the prior proceeding, and (4) the issues were necessary to support a valid and final judgment on the merits.

16

Central Hudson Gas & Elec. Corp., 56 F.3d at 368. In order for MMA to state a breach of contract claim, the Certificates must have been issued in New York, they must not have already been redeemed or otherwise paid, and Plaintiff's claim must not be barred by the statute of limitations, among other factors. All of these issues are determined by the Peru-GCC Award.

*First*, whether the Certificates were validly issued, whether they had been effectively redeemed, and when redemption was scheduled to take place (which, in turn, determines when the statute of limitations was set to run), were raised during the Peru-GCC arbitration and decided by the Tribunal in the Peru-GCC Award. See Peru-GCC Award at 158, 337-38.

*Second*, whether the Certificates were validly issued on the public market, whether they had been effectively redeemed, and when redemption was scheduled to take place were *actually litigated* during the arbitration. As noted in the Tribunal's Award, the Peruvian Corporation, party to the arbitration, argued that GCC was not entitled to an award based in part on the Certificates. Peru-GCC Award at 167-68. More specifically, it was argued that "the Bonds were not issued to the public" and that GCC returned the Certificates to the Government for 90% of their face value plus commission. Id. at 168. Furthermore, the Government of Peru participated in and presented evidence to the Tribunal regarding the status of the contractual debt it owed to GCC as of 1896, which necessarily included the status and effect of the Certificates. See generally Peru's Intervention. The Tribunal discussed the Certificates at great length at various points in its 310-page decision, demonstrating that whether the Certificates were issued to the public, whether they were returned to Peru, and whether their return to Peru was in line with scheduled redemption dates, were disputed throughout the proceedings and considered by the Tribunal.

*Third*, that the Certificates were never publicly issued and instead held by GCC was necessary for the Tribunal to determine its Award. In order for a judgment to be preclusive, "the identical issue necessarily must have been decided" and it must "be decisive of the present action." Lazer Elec. Corp. v. Cecchi, 141 F.3d 1151, 1151 (2d Cir. 1998) (citation omitted); see also Montana v. United States, 440 U.S. 970, 973 (1979) ("Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."). The prior decision of the issue need not have been explicit, "if by necessary implication it is contained in that which has been explicitly decided, it will be the basis for collateral estoppel." Lazer Elec. Corp., 141 F.3d at 1151 (quoting Norris v. Grosvenor Marketing Ltd., 803 F.2d 1281, 1285 (2d Cir. 1986)). If a decision was *necessary* for the arbitrators' judgment it is sufficient to satisfy this requirement. See Emilio v. Sprint Spectrum L.P., 68 F. Supp. 3d 509, 517-18 (S.D.N.Y. 2014).

Here, the arbitrators went to great lengths to ascertain what effect the Certificates had on Peru's debt to GCC *and* whether GCC's holding onto the Certificates and collecting payments from Peru that corresponded to the Certificate redemption schedule thereby extinguished the debt, gutting GCC's claim before the Tribunal. See Peru-GCC Award at 337-38. The Tribunal found that (1) the Certificates were held by GCC and effectively redeemed through Peru's scheduled payments; and (2) that this did not obviate all of GCC's claim, such that GCC could recover some funds. Id. at 337-38, 385-87. Determining the status of the Certificates, and therefore the debt Peru owed to GCC, was more than determining a "colorable reason" for an award: It was necessary in order to establish that some aspect of Peru's debts to GCC (i.e., some amounts beyond those covered by Peru's payments set-off against the Certificates) survived so

as to give GCC some right to additional funds in the arbitration.  Peru-GCC Award at 337-38 (finding that the Certificates had not been publicly issued, that they had been repaid by Peru, and that the loan and guano guarantee still remained despite the repayment); compare with Postlewaite v. McGraw-Hill, Inc., 333 F.3d 42, 48 (2d Cir. 2003) (finding that only finding there was a colorable reason that *may have* existed for an award is insufficient if there remained a "possibility that the arbitrators could have based their award on some other finding" or that ground may not have "actually [been] relied on by the arbitrators.").

*Fourth*, there is privity between Plaintiff MMA and GCC as "holders" of Certificates. Privity between two parties is sufficient to satisfy the party identity requirement.  Rosenthal, 2010 WL 3290994, at *4; Christopher D. Smithers Foundation, Inc. v. St. Luke's-Roosevelt Hosp. Center, No. 00-cv-5501 (WHP), 2003 WL 115234, at *3 (S.D.N.Y. Jan. 13, 2003).  As such, "a court should not fail to apply collateral estoppel principles merely because defendants were not subject to the jurisdiction of [an] arbitration proceeding."  Rosenthal, 2010 WL 3290994, at *4 (internal quotations omitted).  Moreover, the Second Circuit takes a broad view of privity, and requires less than "literal privity" for preclusive effect.  Christopher D. Smithers Foundation, Inc., 2003 WL 115234, at *3.

GCC, a party to the Peru-GCC arbitration, effectively held *all* 3,600 of the Certificates. The Tribunal found that Peru had given GCC *all* of the Certificates, and the Certificates were never validly issued to the public.  Peru-GCC Award at 337-38.  Therefore, at best GCC was effectively the first "bondholder," and any entity making a subsequent claim as a "holder" of the Certificates is necessarily claiming to have succeeded to whatever rights GCC had, and is therefore in privity with GCC.  See Rosenthal, 2010 WL 3290994, at *4; Christopher D. Smithers Foundation, Inc., 2003 WL 115234, at *3.  As such, Plaintiff—who is claiming to be a

legitimate bondholder, is claiming to be in literal privity with GCC, which is more than the Second Circuit requires to establish the preclusive effect of an arbitration award over a third party.  See Christopher D. Smithers Foundation, Inc., 2003 WL 115234, at *3.

**B.**     **Preclusive Effect Would Further The Policies Behind Collateral Estoppel**

Extensive litigation regarding the status of the Certificates and factual determinations made during the Peru-GCC arbitration occurred just after the relevant historical events transpired.  The policy supporting collateral estoppel aims to lend preclusive effect to precisely these kinds of determinations.  "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions."  Montana, 440 U.S. at 153-54; see also Emilio, 68 F. Supp. 3d at 515 ("The doctrine serves to relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." (internal quotation and citations omitted)).

This action seeks to relitigate events from over 140 years ago, that were previously considered and decided by the Peru-GCC Tribunal when it decided *all* issues relating to the Certificates.  Relitigating these issues would require dedicating significant judicial resources and time to issues that have already been decided.  Furthermore, the 14 Certificates at issue here represent a small fraction of the 3,600 Certificates that were never returned to Peru.  Absent preclusive effect being given to the Peru-GCC Award, it is possible that other claimants will purchase Certificates on eBay and attempt to burden this Court with unnecessary and costly litigation.

## IV. PLAINTIFF'S CLAIM IS BARRED BY THE ACT OF STATE DOCTRINE

MMA's claim is also barred by the Act of State Doctrine that applies to Peru's law that extinguished any "internal debt" not acted upon by 1952, which would have been valid. The Act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964). The Act of State doctrine applies to "acts done within their own states, in the exercise of governmental authority." Underhill v. Hernandez, 168 U.S. 250, 252 (1897) ("Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory."). Acts of a foreign sovereign are deemed valid when entered into. Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V., 809 F.3d 737, 744 (2d Cir. 2016).

### A. Internal Peruvian Debt Was Extinguished Under Peruvian Law

In 1937, Peru enacted Law 8599 that extinguished any "internal" debt that was not acted upon within 15 years—i.e., by 1952. Law No. 8599, Art. 3. Had they still been valid, Law 8599 would have applied to the Certificates because the Peru-GCC Award found the Certificates to be part of an internal Peruvian debt as they had been provided by Peru to GCC in Peru under the Peruvian Contract between those parties. Peru-GCC Award at 318. Moreover, Peru had paid any remaining debt to GCC in 1907, and this law extinguished any possible remaining predicate for GCC's claim (or the Certificates that had serviced it). MMA has not claimed that there was any attempt to realize payment on the Certificates prior to 1952.

Hence, the Complaint must be dismissed because Peru's act of state in passing Law 8599, which operated within Peru to extinguish any debt associated with the Certificates in 1952 must be recognized and given effect. See Fed. Treasury Enter. Sojuzplodoimport, 809 F.3d at 743

("the act within its own boundaries of one sovereign State . . . becomes . . . a rule of decision for the courts of this country.'" (citations omitted)).

## CONCLUSION

For all of the foregoing reasons, Defendant respectfully requests that the Complaint be dismissed in its entirety and with prejudice.

Dated: April 4, 2016
New York, New York

WHITE & CASE LLP

By: **/s/ *Owen C. Pell***

Owen C. Pell
Jonathan C. Hamilton
Vanessa Soderberg
Evelyn A. Fanneron
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8891
opell@whitecase.com
jhamilton@whitecase.com

*Attorneys for Defendant*
*The Republic of Peru*