**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

MMA Consultants 1, Inc.,

                     Plaintiff,

      v.

                                       No. 15-cv-5551

The Republic of Peru,

                     Defendant.

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS</u>**

## Table of Contents

I.      THE COURT MAY NOT CONSIDER THE MATERIALS ATTACHED TO PERU'S MOTION TO DISMISS. ...................................................................................... 2

    A.      History of the Chile-France Arbitration and the Proper Scope of the Decision. ........ 2

    B.      The Scope of the Arbitration Was Expressly Limited. .................................................. 3

    C.      Peru Expressly Argued and the Arbitral Tribunal Agreed that Any Award Would Have No Effect on Any Issue of Peruvian Debt Outside of the Limited Scope of the Arbitration and Could Not Be Used in That Way. .............................................................. 3

II.     THE BONDS WERE ISSUED IN NEW YORK CITY, WERE REQUIRED TO BE PAID THERE, AND WERE NOT PAID THERE. ..................................................................... 6

    A.      The Franco-Chilean Award Flatly Contradicts Peru's Assertions. ............................ 6

    B.      The Tribunal's Decision Held that the Bonds Were Issued in New York City, Had Not Been Paid or Cancelled, and Did Not Hold that They Were Internal Debt of Peru. ......................................................................................................................................... 8

        1.      The Tribunal Held that the Bonds Were Issued in New York City. .............. 8

        2.      The Tribunal Did Not Hold that the Bonds Were Internal Debt of Peru. ...... 9

        3.      The Tribunal Held that the Bonds Were Not Cancelled or Paid. .................... 9

III.    PERU IS SUBJECT TO JURISDICTION UNDER THE FSIA. ............................................ 12

    A.      The Foreign Sovereign Immunities Act. ..................................................................... 13

    B.      Peru's Issuance of the 1875 Gold Bonds Was Commercial in Nature. ..................... 13

    C.      The Issuance and Intended Payment of the Bonds Creates a Direct Effect in the United States. ................................................................................................................ 17

IV.     A CONTRACT CLAIM EXISTS AND IS NOT TIME-BARRED. ........................................ 19

    A.      A Contract Claim exists between Peru and the Bondholders. .................................. 19

    B.      The Contract Claim Is Not Time-Barred. .................................................................. 20

V.      THE COMPLAINT IS NOT BARRED BY COLLATERAL ESTOPPEL. ............................ 24

VI.     THE COMPLAINT IS NOT BARRED BY THE ACT OF STATE DOCTRINE. ................. 24

VII.    CONCLUSION. ...................................................................................................................... 26

In a desperate attempt to evade the plain language of the bonds stating that they were issued in New York City on May 1, 1875, and they were signed by a foreign minister of Peru, who affixed the seal of the Republic of Peru to each bond, "in the City of New York on this first day of May, 1875," Peru attached over 400 pages of materials to try to establish that the bonds were not issued in New York, and they were paid.  However, while it is appropriate to submit documents outside of the complaint on a Rule 12(b)(1) motion, the materials attached by Peru cannot be considered by this Court because (1) the Arbitral Award that Peru relies upon was limited in scope and expressly, at Peru's demand, not to be used in connection with any action on a debt owed by Peru, outside of the Arbitration, and (2) the materials submitted in the Lide Declaration are (a) hearsay and (b) not expert opinion.  Therefore, all this Court is left with on Peru's Rule 12(b)(1) motion is the Complaint and the bonds, the plain language of which establishes Plaintiff's claim under the Foreign Sovereign Immunities Act (FSIA), and for breach of contract.

Moreover, even if this Court considers the Arbitral Award, not only does Peru rely on an incorrect reading of it, but also it is highly favorable to Plaintiff.  The Award expressly held that: (1) the bonds were, in fact, issued; (2) the bonds were issued in New York City, consistent with the express language on the face of each bond; (3) the bonds had not been cancelled or superseded in any way; and (4) the bonds had not been paid (or that the Guano Consignment Company of the United States was not paid an amount sufficient to cancel the bonds).  In addition, it is undisputed that the bonds were to be paid in New York, and were not paid there.  Therefore, based on the Award, Peru's arguments why Plaintiff's claim under the FSIA is not appropriate must be rejected.

Furthermore, Plaintiff's action is timely because New York's six-year statute of limitations does not begin to run as to a bearer bond until a demand for payment of the bond has been made and rejected.  That demand was made by the Plaintiff in 2015.  Thus, Plaintiff's action is timely. In addition, as an alternative ground, Plaintiff's action is timely under New York's 20-year statute

of limitations, which applies to the bonds because, on their face, they are secured by the Full Faith and Credit of the Republic of Peru.  The 20-year statute began to run at the earliest in 2004 when the U.S. Supreme Court held, for the first time, in *The Republic of Austria v. Altmann*, 541 U.S. 677 700 (2004), that the FSIA applied retroactively.  Because, until *Altmann,* Plaintiff did not have a forum in which to bring its claim against Peru, the 20-year statute of limitations was equitably tolled until 2004.

Therefore, this Court should deny Peru's Motion to Dismiss.

## I.      THE COURT MAY NOT CONSIDER THE MATERIALS ATTACHED TO PERU'S MOTION TO DISMISS.

The materials attached by Peru cannot be considered by this Court because (1) the Arbitral Award that Peru relies upon was limited in scope and expressly, at Peru's demand, not to be used in connection with any action on a debt owed by Peru, outside of the Arbitration, and (2) the materials submitted in the Lide Declaration are (a) hearsay and (b) not expert opinion.

### A.      History of the Chile-France Arbitration and the Proper Scope of the Decision.

By a decree dated February 9, 1882, Chile, then at war with Peru, agreed to sell 1 million tons of guano and deposit 50% of the proceeds in the Bank of England for the benefit of those Peruvian creditors whose debt was guaranteed by the confiscated guano (hereinafter referred to as the "Bank of England Fund"),[1] and further agreed to the establishment of an arbitral tribunal to determine which of Peru's creditors were entitled to participate in the Bank of England Fund. After the war, the Treaty at Ancon made the arbitration agreement contractual.  The Federal Counsel of Switzerland, at France's and Chile's request, agreed to compose the tribunal.  The

---

[1] Chile deposited £558,565 with the Bank of England, which was a fraction of the total amount that Peru's creditors claimed in the proceeding.  Each qualified creditor was awarded a portion of the Bank of England Fund, but the amount awarded did not represent the total amount of the debt owed.

Franco-Chilean Arbitral Tribunal issued four awards (hereinafter referred to as the "Franco-Chilean Award" or the "Award"). Franco-Chilean Award, p. 79-80.

**B.    The Scope of the Arbitration Was Expressly Limited.**

It was made clear on several occasions prior to and during the Arbitration that its scope and decision were limited to determining which of Peru's debtholders would be allowed to participate in the funds deposited by Chile in the Bank of England.  Thus, the tribunal stated:

> II. The Franco-Chilean Arbitration Tribunal constituted by the Chilean, French and British government "with a view to determining who the parties with a rightful claim are to the amount deposited in the Bank of England and to dividing up said amount among them",

Franco-Chilean Award, p. 79.[2]  The tribunal also stated:

> 4 – ***The Arbitration Tribunal is instituted only to divide up equally the amounts deposited in the Bank of England among Peru's creditors guaranteed by the guano,*** after the legitimacy, validity and ranking of their receivables are recognized.

Franco-Chilean Award, p. 91 (emphasis added).  Thus, the Arbitration was expressly limited to determining which of Peru's debtholders would participate in the Bank of England Fund.

**C.    Peru Expressly Argued and the Arbitral Tribunal Agreed that Any Award Would Have No Effect on Any Issue of Peruvian Debt Outside of the Limited Scope of the Arbitration and Could Not Be Used in That Way.**

Peru vigorously argued -- and the tribunal agreed – that any Award would not have any effect on any issue of Peruvian Debt outside the limited scope of the Arbitration, and could not be used in that way.  Specifically, Peru argued that no determination arising out of the Arbitration could be used for any purpose relating to a debt asserted against Peru.  In other words, any determination by the tribunal relating to the claim of a debtholder of Peru could not be used by

---

[2] Pages 79, 91-92, 97, 164 and 318 of Franco-Chilean Award in this brief refer to certified translations which are attached as Exhibit 1 to the Declaration of Patrick J. Ahern (Ahern Decl.), pages 332-338 are attached as Exhibit 2, and page 100 as Exhibit 3.

that debtholder against Peru in another or later proceeding.  Thus, the tribunal summarized Peru's

arguments regarding the limitation of the arbitration:

> Furthermore, ***the Government of Peru had an express reservation that the jurisdiction of the Arbitration Court would not reach beyond the mission given to it that is to determine the right to receive an equal division of the deposit in the Bank of England, and that, by a decision that shall be handed down, no creditor of Peru may use the ruling of the Arbitration Tribunal to establish any liability on Peru's part;*** thus, ***the State of Peru may not be ordered to pay any amount to any creditor;*** such an order could not validly occur with the Government of Peru having first stated its recognition of the Arbitration Tribunal's jurisdiction for handing down rulings on claims of this nature and that it consents to being subject to an order that might be issued against it by the Arbitration Tribunal.

<u>Id.</u> at p. 97 (emphasis added).  Furthermore, the tribunal recognized this limitation when it wrote:

> 5 – If the Arbitration Tribunal is called upon to rule on the legitimacy and validity of a receivable, it is not due to this that it would be asked to recognize that that receivable is guaranteed by guano and should be paid out of the amount deposited by Chile in the Bank of England, ***the technicality of its ruling should be limited to dividing up this deposit;***
>
> 6 – ***It is not, consequently, within its powers to rule on other claims that could be made against the Governments of Peru and Chile or order one or the other of these governments to pay an amount claimed of it.***

<u>Id.</u> at pp. 91-92 (emphasis added).  The tribunal reinforced this limitation, particularly within the

context of any possible res judicata effect of the tribunal's findings:

> ***Thus, the Arbitration Tribunal does not have jurisdiction to rule on pleadings aimed at anything other than dividing up the deposit in London but rather their ruling must be limited to determining the claimants who are entitled to the deposit in London and to what extent they are so entitled. And the Ruling will have the effects of res judicata only within these limits. No other provision of the Arrangement confers on the Tribunal the right to rule on the pleadings aimed directly against the State of Peru.*** In any event, Peru's consent is indispensable to establishing the validity of a clause of this type and this consent is inarguably missing. Furthermore, the State Parties to the Arrangement – Chile, France and England – never dreamed of conferring those prerogatives on the Arbitrators.
>
> ***The Arbitration Tribunal may not hear claims that go toward having the State of Peru be recognized as the debtor of some service rendered;*** Therefore, certain Parties such as Dreyfus frères et Compagnie and the Compagnie financière et commerciale du Pacifique – wrongly – intend to have the State of Peru be found to be their debtor in the dispositive section of the Arbitration Ruling.***;***

Id. at p. 100 (emphasis added).  The effect of Peru's protestations at the time is a double-edged sword against Peru now.  First, because Peru argued that the tribunal's decision could not be used in any other proceeding, this Court should not consider the tribunal's decision here, and Peru should be estopped from using the tribunal's decision here.  Second, as seen below, even if this Court does consider the tribunal's decision, it is highly favorable to Plaintiff's claim.

Furthermore, the materials submitted in the Lide Declaration are (a) hearsay and (b) not expert opinion, and therefore, should not be considered by this Court.  As a threshold matter, even though this Court is allowed to make factual determinations on a Rule 12(b)(1) motion, any such factual determinations must be made on admissible evidence.[3]  The Lide Declaration is decidedly not admissible evidence, being based entirely on hearsay – newspaper articles – and not based on expert opinion.  Mr. Lide is a researcher, who searched for and gathered newspaper articles.  Mr. Lide has neither employed nor set forth any scientific methodology that would qualify him as an expert.  He engages in "historical research," which is to say that he searches for facts from various sources.  However, those "facts" are based entirely on hearsay.  Moreover, even if Mr. Lide was an expert, his "opinion" would not aid the Court, which can review old newspaper articles (if the Court were so inclined) as well as Mr. Lide can.  In addition, experts who merely summarize documents and facts have had their opinion excluded because such opinions do not aid the Court.  Therefore, this Court should not consider the Lide Declaration and the newspaper articles attached thereto.[4]  Finally, the Lide Declaration should not be considered because his two principal conclusions – that there is no public report of the bonds being issued to the public in New York

---

[3] *See Taylor v. U.S. Office of Pers. Mgt.*, 2015 U.S. Dist. LEXIS 75000, at *7 (D. Hawaii 2015) ("The court is permitted to consider admissible evidence outside the pleadings on a Rule 12(b)(1) challenge.).

[4] If this Court decides that it will consider the Lide Declaration as a basis for making factual determinations under Rule 12(b)(1), Plaintiff requests the opportunity to take discovery, including Mr. Lide's deposition, and also requests an evidentiary hearing.

City, and that there was no public report of the redemption of the bonds – are not relevant facts. See discussion, infra, pp. 9 fn. 9, 14 and 21.

## II.   THE BONDS WERE ISSUED IN NEW YORK CITY, WERE REQUIRED TO BE PAID THERE, AND WERE NOT PAID THERE.

First, the plain language of the bonds states that they were issued in New York City on May 1, 1875, and they were signed by a foreign minister of Peru, who affixed the engraved seal of the Republic of Peru to each bond, "in the City of New York City, on this first day of May, 1875." Moreover, it is highly significant that Peru does not contest that the bonds are authentic and the signature of the foreign minister of Peru and the engraved seal of Peru are authentic. In other words, Peru does not contend that the signature of the foreign minister of Peru was a forgery, or the engraved seal of Peru was a fake. Second, contrary to Peru's contention, according to the Arbitration Decision, the bonds were issued in New York City. Therefore, Peru's argument that the bonds were not issued in New York must be rejected.

### A.   The Franco-Chilean Award Flatly Contradicts Peru's Assertions.

Peru bases its entire Motion to Dismiss on an incorrect reading of the Award. Starting with even mischaracterizing the name of the Arbitration decision, Peru refers to the Peru-GCC Award, when in fact the name of the Arbitration is the Chile-France Arbitration and the name of the Award is the "Franco-Chilean Award".[5] In fact, Peru was not even a direct party to the Arbitration. More

---

[5] While Peru mischaracterizes the holding of the Franco-Chilean Award and attached it only partially, it entirely mischaracterizes the very nature of other documents that it has attached as exhibits.

It attaches as Exhibit D what it describes as "Peru's intervention in the Arbitral Proceedings" but the actual document is a communication from the Legation of Peru in Switzerland to the Secretary of State Foreign Affairs Office summarizing a report from GCC and asking for confirmation from Peru regarding GCC's debt. Peru's limited role in the arbitration was to confirm the debt owed to it by the creditors seeking payment from the Bank of England Fund.

It also describes a document that it attaches as Exhibit E as proof that "Peru accepted the Peru-GCC Award of 1901, and, in 1907, ordered payment to GCC as 'definitive cancellation of any remaining contractual debt once GCC turned over al 3,600 Certificates.' " However, the document is actually a report submitted

importantly, Peru's statements about the holdings in the decision are flat wrong.[6]  According to Peru, the Franco-Chilean Award held that the bonds were never issued, they were not issued in New York, they had been paid (except where it contradicts itself and claims that the bonds had not been paid),[7] and they were internal debt of Peru.  However, the Arbitral Tribunal actually held that the bonds were issued, they were issued in New York, and they had not been paid or cancelled, and did not hold that the bonds were internal debt of Peru.

Further, the Arbitration Tribunal held that (1) the bonds were originally issued as a way to guarantee the payment of Peru's previous debt, and (2) the fact that the bonds had not been paid left the original debt as due and owing, even while the original debt and the bonds co-existed, according to Article 18 of the May 1, 1875 Agreement.  Thus, the award to GCC of a small portion of the Bank of England Fund as partial compensation of the original debt did not affect the status of the bonds in any way.  Moreover, the bonds represented only a portion of the $7,026,653.38 that Peru owed to GCC as certified by the Peruvian Court of Auditors that supervised the liquidation of GCC. Franco-Chilean Award, p. 332.  Thus, contrary to the assertions of Peru, as of 1901, Peru still owed GCC for the amount represented by the bonds, in addition to the other money

---

by the Ministry of Treasury and Commerce to Congress.  There is no indication that Congress ever passed the law or that it paid GCC.

[6] It is ironic that Peru's counsel sent Plaintiff's counsel a Rule 11 letter on March 4, 2016, claiming that the bonds had never been issued, and invoking the Franco-Chilean Award (which it just provided a link to a French version and did not provide Plaintiff with any translation).  Obviously, based on the plain language of the Award, Peru's Rule 11 letter lacked a sufficient basis.

[7] Peru contradicts itself on this point in its own memo.  First it argues that, "...GCC kept the Certificates, and on each redemption date from 1876-1880 was paid by Peru for a portion of the Certificate (plus a commission), as Peru and GCC had agreed in their Contract." *MTD p. 6.*  Next it argues, "In this context, the Tribunal recognized that ... (2) Peru made the scheduled payments on the Certificates..." (*MTD p. 7)* and then later writes, "By that date, the Bonds were invalid on their face--and the Peru-GCC Award found that GCC had never been paid." *MTD p. 15.*  Then, it cites the award as "finding that the Certificates had not been publicly issued, that they had been repaid by Peru, and the loan and guano guarantee still remained despite the repayment." *MTD p. 19.*

7

that it owed to GCC, and both Peru and GCC agreed that the bonds had not been paid.[8]  Most

importantly, the tribunal found that GCC was free to sell the bonds in order to obtain payment of

the debt still owed to it by Peru.

> **B.**     **The Tribunal's Decision Held that the Bonds Were Issued in New York City, Had Not Been Paid or Cancelled, and Did Not Hold that They Were Internal Debt of Peru.**

> **1.   The Tribunal Held that the Bonds Were Issued in New York City.**

The Arbitral Tribunal made it clear that the bonds were issued, and they were issued in

New York City, consistent with the statement on the face of each bond.  Thus, the tribunal held

that Peru issued the bonds to GCC:

> Whereas, in fact, that ***the certificates were undoubtedly issued by the Government of Peru to the Company,*** which owns them currently, as appears from its own submission in this trial…that it paid to the Government's agents, who were also none other than its own agents, the 2 ½% issuance commission laid down in Art. 6 of the Contract, and debited the State for it.

Franco-Chilean Award, p. 337 (emphasis added) (pages 332-338 are attached as Ex. 2 to Ahern

Decl.).  Moreover, the tribunal also held that the bonds were issued in New York City.  The

Peruvian Corporation, one of Peru's creditors, argued that GCC should not participate in the Bank

of England Fund because GCC was a domestic, not a foreign, creditor.  The Arbitral Tribunal

rejected this argument, expressly holding that the bonds were issued in New York:

> The 1866 bonds, which at the beginning were part of the Company's receivables, ***were issued in New York with interest payable and capital repayable in New York; the same applies to the 3,600 1875 certificates.***

Franco-Chilean Award, p. 164 (emphasis added).  Thus, Peru's assertion that "the Tribunal

recognized that the Certificates were not validly issued to the public, whether in New York by

Hobson, Hurtado & Co., or in the United States, and were never redeemed," (*MTD, p. 6*) is

---

[8]Peru recognized that the bonds were still outstanding in 1907 when its Ministry of Treasury submitted a resolution to Congress requesting that it authorize funds to buy back the bonds. *See MTD Exhibit E.*

incorrect and misleading.  The Arbitral Tribunal clearly held that the bonds were issued in New York.[9]

### 2.   The Tribunal Did Not Hold that the Bonds Were Internal Debt of Peru.

Peru also argues that "the Peru-GCC Award found the Certificates to be part of an internal Peruvian debt as they had been provided by Peru to GCC in Peru under the Peruvian Contract between those parties." *MTD at p. 21*.  However, contrary to Peru's assertion, the Arbitral Tribunal held that any distinction based on internal or external debt was "unfounded":

> But even ***the principle of the distinction established by the opposing parties between Foreign Debt and Domestic Debt is unfounded;*** and it cannot be justified either under the Decree of February 9, 1882, or under the Peace Treaty of Ancon of October 20, 1883, or under the Protocol of July 23, 1892; that in fact, the Decree of 1882 confined itself to stating that the net revenues from guano 'would be equally allocated between the Government of Chile and Peru's creditors, whose debt securities were secured by the guano guarantee (Art. 13)', without even mentioning Foreign Debt or Domestic Debt in any of its provisions, that on this point, we cannot replace Chile's intents with assumptions...

Franco-Chilean Award, p. 318 (emphasis added).  Thus, the tribunal did not hold that the bonds were internal debt of Peru.

### 3.   The Tribunal Held that the Bonds Were Not Cancelled or Paid.

Significantly, the Arbitral Tribunal determined that the bonds had not been paid or cancelled.  First, the tribunal held the issuance of the bonds did not constitute payment of Peru's earlier debt, but that the two obligations coexisted:

> Whereas, on the other hand, that the opponents' thesis, whereby the Contract of 1875 would have produced extinction by novation or *datio in solutum* of the Company [GCC}'s claim, is based on an incorrect assessment of the conditions for the issuance of the certificates and of the will of the Parties expressed in the Contract;

---

[9] Moreover, Peru's argument also misses the mark because the bonds are bearer bonds.  Thus, there is no requirement that they be issued straight into what Peru calls "the public market."  The bonds by their terms are payable by Peru to GCC "or bearer."  So, as long as the bonds were issued to GCC in New York City, as the tribunal found, then that is sufficient for FSIA purposes.  If GCC later decided to sell some or all of the bonds to the public, then as a holder of bearer bonds, it was entitled and free to do so.

That, in fact, Art. 18 of the Contract, formally reserving "the stipulations of the Contracts and other previous decisions insofar as the are not contrary to the express provisions of this agreement," states that "the fact that a portion of the Company's claim took the form of certificates shall at no time be considered, *as concerns the effects those Contracts* as having constituted the payment or the extinction of such Government debt, *if it's not for the portion of the latter that will represent the actually depreciated value of the certificates.*

That this provision, clearly shows, on the one hand, that the Parties had contemplated the eventuality where the Company would underwrite the certificates on its own account, and on the other hand, that the certificates were never delivered to the Company in place of payment (*solutionis causa*) but only in order to allow it to seek its payment by a determined method (*solvendi causa*), the original claim retaining its force as long as the certificates had not been "*actually depreciated,*" which means as long as payment of the certificates has not been obtained; that the former obligation thus coexisted with the new one to produce its effects in favor of the creditor if the latter was not satisfied in the manner intended by the Parties; that, in these circumstances, the presentation of the certificates also did not produce novation of the original claim;

Franco-Chilean Award, pp. 337-38 (emphasis original).  Next, Peru's other creditors argued that the bonds had been paid, relying on the fact that GCC had debited the amount of the bond payments on its books.  The tribunal rejected this argument because, although the amounts were debited for accounting purposes, no actual payment had occurred – ***"the Company has been unable to obtain its payment"***:

Thus the Company's original claim, whose certificates were to be used to obtain the extinction, currently remains, with all the rights that were attached thereto, to the extent that the applicant has not obtained its actual payment through securities; ***that the only question that therefore arises is whether  the certificates are now paid and amortized;*** that the Corporation and Societe Generale [other Peruvian creditors] see proof of this amortization in the fact that the certificates were brought to maturity by debiting the State in Peru's current account;

***But this entry specifically shows that the actual depreciation, which is to say provided from Peru's funds or from the proceeds from the sale of guano, has not occurred,*** and ***that the Company has been unable to obtain its payment;*** whereas the Company's situation from this point of view is in all respects analogous to that of a creditor to whom the debtor has delivered or endorsed installments *sovendi causa*, and carries them in new account, because payment cannot be obtained at maturity; and that no one has yet been advised to consider, in such cases, including the amount of the instrument as debited to the payer or the guarantor as evidencing that the bearer has been paid;

> Whereas therefore that, from the moment when the proceeds of the consignment or the free sale did not meet a deadline, the Company was authorized to debit the State the amount of depreciation of the coupon not covered;

Franco-Chilean Award, p. 338 (emphasis added).  Thus, it is clear that the Arbitral Tribunal held that the bonds had not been paid or cancelled (as satisfied).

Moreover, Peru offers no plausible explanation why, if it paid the bonds, it did not insist on their return at the time of payment.  Certainly, the issue of whether or not the bonds had been paid was a hotly contested issue.  It makes no sense that Peru would not have demanded the return of the bonds upon payment.  Peru's only explanation – that GCC failed to return the bonds – defies logic and therefore is implausible.  The more plausible explanation is that the bonds were never paid, which the Arbitral Tribunal found, and which Peru has not provided evidence to the contrary.

Finally, the tribunal acknowledged that GCC was free to sell the certificates to another bearer.  Thus, the tribunal referred to the possibility of GCC "alienating" the bonds:

> Whereas it is proper to consider the possible consequences of an alienation of the certificates by the Company, and to examine whether in that eventuality the Company's receivable would have been definitively extinguished up to the amount of the certificates placed in circulation, or whether the Company was required, according to its 1875 Contract, to meet the service of the interest and any amortization out of its own money, in which case it would incontestably have had the right to debit the State for its advances in its current account;

Franco-Chilean Award, p. 338.  As noted above, the amount of the debt that Peru owed to GCC stood at $7,026,653.38.  The tribunal awarded GCC 2/32 of the Bank of England Fund -- £69,819.96 or $327,455.61 (1901 exchange rate was 4.69 pounds to 1 US dollar), which did not extinguish the original debt and certainly did not extinguish the bonds.  Thus, GCC was free to sell the bonds to another bearer at any time in order to recoup some of the funds that it was owed by Peru.  Finally, the fact that fourteen (14) of the bonds are now in Plaintiff's possession is evidence – or at least creates a reasonable inference – that GCC did sell some or all of the bonds.

Finally, the 1907 document submitted by Peru, if considered by the Court, is an admission by Peru that (1) the certificates had not been paid as of 1907, contrary to Peru's interpretation of the Franco-Chilean Award, and (2) the entire amount of $7 million that was owed to GCC was still due and owing. That is the bad news for Peru. The worse news is that the 1907 document is a recommendation from the Ministry of Finance to the Peruvian Congress that Peru pay GCC $7 million. However, there is no evidence that Peru ever did pay GCC or that the Peruvian Congress ever acted on this recommendation. If either event had occurred, no doubt Peru would have let this Court and Plaintiff know.

## III.   <u>PERU IS SUBJECT TO JURISDICTION UNDER THE FSIA.</u>

Peru argues that there is no jurisdiction under the FSIA because the bonds were not issued in New York. However, this argument should be rejected for several reasons. First, as shown above, Peru cannot rely on the materials submitted in support of its Motion because the Franco-Chilean Award cannot be used in any subsequent proceeding on a debt owed by Peru, and the Lide Declaration is inadmissible hearsay and not admissible expert opinion. Thus, the Court is left with the plain language of each bond, which is sufficient to establish the commercial activity exception under the FSIA. Second, as shown above, even if the Award is considered, it held that the bonds were issued, they were issued in New York, and they had not been paid or cancelled.

Third, the holding of the Arbitral Tribunal is entirely consistent with the face of the bonds, which provides in plain language that the bonds were issued in New York City. Indeed, it is the statement of the foreign minister of Peru that he signed each bond and affixed the engraved seal of Peru to each bond "in the City of New York, on this first day of May, 1875." Moreover, it makes no sense that a foreign minister of Peru would make such a statement and physically affix the engraved seal of Peru on each bond and state that he did so in New York City on May 1, 1875

– if he had not in fact done so.  Furthermore, Peru offers no explanation as to why the statement

on each bond is not true or the engraved seal on each bond is not true and authentic.  Indeed, Peru

nowhere contends that the bonds are not authentic, that the signature of the foreign minister of

Peru is a forgery, or that the engraved seal of Peru is a fake.

Finally, the undisputed fact that the bonds were to be paid in New York City, and were not

paid there establishes jurisdiction under the third prong of the commercial activity exception – the

direct effect in the U.S.

In light of all of the above facts, it is clear that Plaintiff has met its burden of demonstrating

sufficient facts to establish the commercial activity exception regarding Peru's issuance of the

bonds in New York City, and the direct effect in the U.S. of Peru's failure to pay the bonds.

### A. The Foreign Sovereign Immunities Act.

A U.S. court will have subject matter jurisdiction over a foreign sovereign under the FSIA

if the "commercial activities" exception applies. *Argentina v. Weltover,* 504 U. S. 607, 611 (1992).

There is a two prong analysis to determine whether the exception applies: (1) whether the activity

is "commercial" in nature; and (2) whether the commercial activity had a "direct effect" in the U.S.

*Id.* at 618-19.

### B. Peru's Issuance of the 1875 Gold Bonds Was Commercial in Nature.

It is well settled that bonds issued by foreign governments are "garden-variety" debt

instruments of a commercial nature. *Weltover,* 504 U.S. at 615 ("The commercial character of the

[bonds] is confirmed by the fact that they are in almost all respects garden-variety debt

instruments."); *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1018 (2d Cir. 1991) ("issuing a

public debt is a commercial activity within the meaning of Section 1605(a)(2)."). *Shapiro*

specifically held that the issuance of bearer instruments in New York satisfied the commercial

activity exception. Thus, the Court held:

> We know of no theory that would cause us to read the FSIA to allow a foreign state to issue bearer notes to an intermediary in the United States and then to deny that it was engaged in commercial activity as defined in the FSIA.  The very presence of such highly transferable instruments, whether or not the initial holder successfully discounts them in the country suffices to satisfy the 'substantial contact' requirement of the statute.  The United States has a strong interest in capital raising activities within its borders."

*Id.*  Based on *Weltover* and *Shapiro*, the issuance of the bonds in New York City by Peru satisfies the commercial activity exception.

Moreover, it is clear from the face of the bonds that Peru intended the bonds to be issued in New York and to be paid in New York.  The bonds are denominated in U.S. dollars and were required to be paid in New York at the offices of Hobson, Hurtado and Company, financial agents of Peru, which as noted by the tribunal, was paid its commission of 2 1/2 % when the bonds were issued.  The bonds specifically state that Don Manuel Freyre, the Plenipotentiary of Peru in Washington, affixed his seal to, and signed, each bond on behalf of the government of Peru, in the City of New York.  In addition, the drawings to determine which bonds were to be paid were to occur in New York City and the notices as to the drawings were to be placed in two New York morning dailies, clearly showing the local effect of the bond placement.

Against these overwhelming facts, Peru's claim that the bonds were "provided" to GCC in Peru is a factual conclusion that is completely unsubstantiated.  In addition, Peru's other "facts" in support of its contention that the bonds weren't issued in New York -- that there was no report in certain New York newspapers that the bonds had been issued to the public or did not appear in public records – are inadmissible hearsay, inadmissible opinion, irrelevant, and do not alter the fact that the bonds were issued.[10]  It is patently absurd to contend that for a bond issuance to occur, the fact of it must appear in newspapers and other public records.  Therefore, against the facts

---

[10] If this Court considers that any of the facts submitted by Peru support a factual determination justifying a holding that the FSIA does not apply, Plaintiff requests the opportunity to take discovery, and an evidentiary hearing.

shown by Plaintiff, Peru has failed to meet its burden of persuasion. *See Robinson v. Government of Malaysia,* 269 F.3d 133, 140-142 (2d Cir. 2001).

In *Robinson*, the Second Circuit set forth the proper analysis to be applied to a Rule 12(b)(1) motion involving the FSIA -- a burden shifting from the defendant to the plaintiff, with the defendant foreign sovereign ultimately bearing the burden of persuasion.  Thus, the Court held:

> If the defendant challenges the factual basis of the plaintiff's claim, "the plaintiff has the burden of going forward with evidence showing that, under exceptions set forth in the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." In other words, in assessing whether a plaintiff has sufficiently alleged or proffered evidence to support jurisdiction under the FSIA, *a district court must review the allegations in the complaint, the undisputed facts, if any, placed before it by the parties, and -- if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue -- resolve disputed issues of fact, with the defendant foreign sovereign shouldering the burden of persuasion.*

Thus, under *Robinson*, Plaintiff has come forth with the well-pleaded allegations of the Complaint, and the plain language of the bonds – both of which demonstrate that the bonds were issued in New York City by Peru, were to be paid in New York City, and any breach for failure to pay the bonds occurred in New York City.  If that is all that is before the Court – by which we mean that the materials submitted by Peru cannot be considered by the Court for the reasons stated above, then Plaintiff has satisfied its burden of production that Peru is subject to the commercial activity exception because it issued the bonds in New York City.  In addition, if that is all that is before the Court, then Peru has not met its burden of persuasion on its contention that the bonds were not issued in New York City.

Moreover, even if the Franco-Chilean Award can be considered by the Court, Plaintiff has still met its burden of production because, in addition to the well-pleaded allegations in the Complaint and the bonds, the Award also sets forth facts that the bonds were issued, were issued in New York City, and had not been paid or cancelled – as set forth in detail above.  And, since Plaintiff has met its burden of production on the issue that the bonds were issued in New York,

Peru then has the burden of persuasion on that issue.  However, the same materials that allow Plaintiff to meet its burden of production prevent Peru from meeting its burden of persuasion – burden of proving by a preponderance of the evidence that the bonds were not issued in New York. *Id.* at 141 n. 8 ("the defendant must show that the alleged exception does not apply by a preponderance of the evidence").

Finally, as noted above, each bond was signed by a foreign minister of Peru, who also affixed the engraved seal of Peru on each bond, and stated in writing that he did so "in the City of New York, on this first day of May, 1875."  The clear inference from this is that the bonds were issued in New York City; there would be no reason for the foreign minister of Peru to sign each bond, and affix that seal of Peru to each bond, with the statement that he was doing so in New York City on May 1, 1875, if in fact he was not doing so.  Peru has not alleged that the signature of the foreign minister of Peru was a forgery or the engraved seal of Peru was a fake; nor has Peru offered any explanation as to why the foreign minister of Peru would undertake all of the above if he had not in fact done so.  Thus, all of the reasonable inferences from the facts above carry Plaintiff's burden, and any competing inferences asserted by Peru do not carry its burden of persuasion. *See Skanga Energy & Marine Ltd. v. Arevenca S.A., et al.,* 875 F. Supp. 2d 264 (S.D.N.Y. 2012), *aff'd,* 2013 U.S. App. LEXIS 7205 (2d Cir. 2013).

*Skanga Energy* involved a similar situation of strained inferences asserted by PDVSA, as against the inferences that Skanga Energy created based on unambiguous documents.  Judge Cote held that Skanga Energy had met its burden of production and PDVSA had not met its burden of persuasion, in part because PDVSA's competing inferences required the Court to embrace an implausible inference of a complicated scheme to defraud, over the reasonable inference put forth by Plaintiff based on unambiguous documents.  Thus, Judge Cote stated:

> under the "reasonable inference" standard, which PDVSA concedes applies, Skanga has carried its burden of pleading that an agency relationship existed. Any competing set of inferences would require one to speculate that Arrundell and other Venezuelan officials were engaged in a scheme to defraud Skanga, that PDVSA remained ignorant of the scheme, and that Venezuela itself chose to reward Arrundell by appointing him its Ambassador to Nigeria.

Likewise, in this case, Peru's argument would require this Court to embrace implausible inferences that the signature of the foreign minister of Peru was a forgery, the engraved seal of Peru was a fake, and the foreign minister signed each bond in New York and affixed the seal to each bond when he in fact had not. Therefore, this Court should reject Peru's argument that the bonds were not issued in New York City.

Judge Cote also held that, even if she considered PDVSA's inferences plausible, she was not required to rule in PDVSA's favor with respect to the FSIA. Instead, Judge Cote held:

> Even if these competing inferences could also be deemed plausible, dismissal would not be appropriate. "The choice between or among plausible inferences or scenarios is one for the factfinder," and a court ruling on a Rule 12 motion "may not properly dismiss a complaint that states a plausible version of . . . events merely because the court finds a different version" plausible. *Anderson News, L.L.C. v. American Media, Inc., 680 F.3d 162, 2012 WL 1085948, at \*19 (2d Cir. 2012)*.

Thus, based on *Robinson* and *Skanga Energy*, Plaintiff has not only set forth facts, in the form of the bonds -- which Peru concedes are authentic -- but also the Award, if considered by the Court, provides additional facts supporting the fact that the bonds were issued, they were issued in New York City, and they have not been paid or cancelled. Therefore, Plaintiff has met its burden of production, and Peru has not met its burden of persuasion. Finally, under *Skanga Energy*, even if Peru had set forth plausible inferences, this Court should not grant Peru's Rule 12(b)(1) in the face of competing plausible or reasonable inferences.

## C.   The Issuance and Intended Payment of the Bonds Creates a Direct Effect in the United States.

Jurisdiction over Peru is also proper under the alternative ground provided by the third prong of the commercial activity exception, which is satisfied when there is a direct effect in the

U.S.  The Supreme Court in *Weltover* found that there is a direct effect in the U.S. where a foreign sovereign issued bonds in the U.S., the bonds are denominated in U.S. Dollars, the bonds are payable in the U.S. and a financial agent is appointed in U.S.  In such a case, the foreign sovereign has "purposefully availed itself of the privilege of conducting activities within the United States." *Weltover,* 504 U.S. at 619; *Shapiro*, 930 F.2d at 1019.  As noted above, such is the case here.  The bonds are denominated in U.S. dollars and were required to be paid in New York at the offices of Hobson, Hurtado and Company, financial agents of Peru.  In addition, the drawings to determine which bonds were to be paid, were to occur in New York City and the notices as to the drawings were to be placed in two New York morning dailies, clearly showing the local effect of the bond placement.  Finally, all of the above facts, drawn from the face of each bond, are not disputed by Peru.  According to Peru's own arguments, if Plaintiff's allegations that the bonds were to be paid in New York City and they were not paid there, are true, "then there might be a basis for jurisdiction under the FSIA." *MTD, p. 10.*  Based on the uncontroverted facts above that the bonds were to be paid in New York City, and they were not, this Court has jurisdiction over Peru under the FSIA.

Moreover, Plaintiff has met its burden of production on the direct effect issue and Peru has not offered any evidence controverting Plaintiff's facts. *See Skanga Energy*, 2013 U.S. App. LEXIS 7205 at *3-4.  In *Skanga Energy*, the Second Circuit held that, as here in connection with the direct effect prong, PDVSA had not set forth any facts to controvert Skanga Energy's facts based on unambiguous documents.  Thus, the Court held:

> With respect to agency the District Court concluded that the plaintiff-appellee, Skanga Energy & Marine Limited ("Skanga"), "carried its burden of pleading that an agency relationship existed" by providing "circumstantial evidence at the pleading stage to establish a reasonable inference of a PDVSA agency relationship with Arevenca." ***We agree that Skanga carried its burden of establishing an agency relationship through its allegations about Enrique Arrundell's statements and activities and the transaction documents - including a bill of lading for the purported diesel shipment - bearing PDVSA's logo. PDVSA, on the other hand, failed to submit any evidence indicating that Arevenca lacked authority to act on PDVSA's behalf.*** As a result, there was no "factual

dispute," *Robinson, 269 F.3d at 141*, for the District Court to resolve as to whether an agency relationship existed, see *Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002)*. ***Accordingly, the District Court properly concluded that PDVSA failed to meet its burden of demonstrating that the commercial activities exception does not apply.***

*Id.* (emphasis added).  Therefore, based on *Skanga Energy,* since Plaintiff has set forth facts establishing a direct effect in the U.S. – as the bonds were required to be paid in New York City – and Peru has not controverted – and cannot controvert -- those facts, Peru is subject to jurisdiction under the FSIA and its Rule 12(b)(1) Motion to Dismiss should be denied.

## IV.    A CONTRACT CLAIM EXISTS AND IS NOT TIME-BARRED.

### A.    A Contract Claim exists between Peru and the Bondholders.

Peru's argument that "MMA does not allege the existence of any contractual relationship between MMA and the Peruvian State other than the 14 Certificates it allegedly possesses" *( MTD, p. 15),* misapprehends the nature of a bearer bond.  Under New York law, "[b]earer bonds are payable, not to a named person, but to whatever person possesses them …." *U.S. v. Bloom,* 865 F.2d 485, 487 (2d Cir. 1989).  Furthermore, a "bearer bond after maturity becomes a 'payable on demand instrument' – the equivalent in all legal qualities to money itself, and circulates as such, as a treasury note payable on demand." *Kubil v. Rosetti,* 34 N.Y.2d 68, 312 N.E.2d 167 (N.Y. 1974) (contentions of counsel recited as part of published decision, citing *Morgan v. U.S.*, 113 U.S. 476 (1885); *see also, Rogers v. Petroleo Brasiliero, S.A.,* 741 F. Supp. 2d 492 (S.D.N.Y. 2010) (denying Rule 12(b)(6) motion in action brought on bearer bonds), *rev'd on other grounds*, 673 F.3d 131 (2d Cir. 2012).  Thus, based on New York law, bearer bonds are negotiable instruments payable to "whatever person possesses them."  Moreover, under New York law, a bond is a contract, *NML Capital Ltd. v. Argentina,* 699 F.3d 246, 258 (2d Cir. 2012), *citing Arch Ins. Co. v. Precision Stone, Inc.,* 584 F.3d 33, 39 (2d Cir. 2009) ("In New York, a bond is a

19

contract...").  Therefore, Peru's argument that Plaintiff cannot state a claim for breach of contract

on the bonds must be rejected.

### B.        The Contract Claim Is Not Time-Barred.

Plaintiff's action is timely on one of several independent grounds.  First, applying New

York's six-year statute of limitations, Plaintiff's action does not accrue, and the statute of

limitations does not begin to run, until Plaintiff has suffered injury or a breach by Defendant

occurs. *See Rogers v. Petroleo Brasileiro, S.A.*, *supra*.  With respect to a bearer bond, that injury

occurs and the action accrues when demand for payment is made and that demand is rejected. 741

Supp. 2d at 510 fn. 12.  In *Rogers,* the Court held that the six-year statute of limitations -- applied

to an action to collect on a bearer bond -- did not begin to run until the issuer of the bond refused

or rejected a demand for payment on the bond.  Thus, the Court stated:

> In its moving papers, Defendant also argues that "plaintiffs' claims are untimely on the face
> of the complaints," because of New York's six-year statute of limitations for breach of
> contract. (Def. Br. 21-22) ***Defendant incorrectly argues, however, that the limitation
> period began to run from the maturity dates of the bonds*** — December 31, 1977, 1979
> and 1980 — rather than the date the action accrued according to the facts pleaded in the
> Complaints. ***The Complaints clearly allege that Defendant's breach occurred on June
> 25, 2009, when Petrobras refused Plaintiffs' conversion requests, giving Plaintiffs until
> 2015 to assert breach claims.***

*Id.*  Thus, under *Rogers,* the six-year statute of limitations did not begin to run until Peru failed to

respond to repeated demands for payment made by Plaintiff, made in 2015.  *See also, Shan v.*

*Citibank, N.A.,* 2007 U.S. Dist. LEXIS 58875, at *15 (S.D.N.Y. 2007) ("The statute of limitations

begins to run when demand for repayment … is made. N.Y. C.P.L.R. §206(a)(2).  An inquiry

followed by a refusal to pay the deposited money triggers the statute of limitations.").  Moreover,

cases involving bearer bonds that have not been paid present a different situation than cases

involving bonds with set maturity dates and where the default on the bonds was already known.

Here, Peru contends to this day that the bonds were paid.  In addition, not until February 3, 2012,

when Peru published a notice in El Peruano, did Peru identify the 1875 bonds specifically and

indicate that it would not pay them, once again invoking Law No. 8599. See Ahern Decl., Ex. 4. In light of these facts, it could not have been known before February 3, 2012, at the earliest, and Plaintiff did not know, that Peru was going to refuse to pay the 1875 bonds in question.

In addition, there is no fixed maturity date on the bonds. Instead, the bonds provide that Peru would call them for redemption on certain dates. Moreover, a holder of a bond could not present and collect the bond on the dates set forth on the bond, because Peru had to call the bonds for payment (by providing notice of the drawings), and was to do so in tranches, selecting the bonds by number. However, when that did not happen, there was no maturity date for the bonds. The only way in which a bond could be repaid was to be presented to Peru for payment, which Plaintiff did. Thus, there was no date – maturity date or otherwise – that would have triggered the running of the statute of limitations. *See, e.g., City of Fairview v. Norris*, 234 F.2d 199, 204 (10th Cir. 1956) (statute of limitations did not run on the maturity date, which was "not a due date in the sense that the bond can be presented and collected at that date").

Furthermore, not until Peru indicated in 2015 that it would not pay the bonds in question, in response to Plaintiff's demand, did Plaintiff actually know that Peru would not do so. Merely invoking the prior Peruvian Law 8599 is also insufficient to put Plaintiff on notice because that law only applied to "Domestic Debt" and did not identify the 1875 bonds. Therefore, based on the facts as pled, (1) Plaintiff was not on notice that Peru would not pay the bonds until it made a demand for payment, (2) the bonds as bearer bonds could be presented to Peru at any time until paid, and (3) there was no effective maturity date for the bonds. Under these circumstances, it would not be appropriate for this Court to grant Peru's Rule 12(b)(6) motion based on the statute of limitations. *See, e.g., Kupfer v. Federal Republic of Germany,* 2010 U.S. Dist. LEXIS 145454, at *7 (S.D.N.Y. 2010) ("These indeterminate allegations coupled with the checkered history of the

Bonds do not allow for pre-discovery dismissal based on the statute of limitations.").  Applying *Kupfer* to this case, there is certainly a "checkered history" of the bonds, and there are also specific allegations that the bonds are bearer bonds, and that Plaintiff only recently made a demand that Peru refused.  There is also the fact that the bonds on their face did not have a "due date" and that they had no real or effective maturity date.  Based on all of this, *Kupfer* indicates that this Court should not grant Peru's Rule 12(b)(6) motion to dismiss based on the statute of limitations.

Second, the 20-year statute of limitations applies to Plaintiff's action because the bearer bonds in question are secured by the Full Faith and Credit of the Republic of Peru. See N.Y. C.P.L.R. §211(a). Under §211(a), the limitations period applies to "[a]n action to recover principal or interest upon a written instrument evidencing an indebtedness of the state of New York or of any person, association or public or private corporation, … secured only by a pledge of the faith and credit of the issuer."  The bonds in questions provide in pertinent part:

> Know all men by these presents, that I the Undersigned Envoy Extraordinary and Minister Plenipotentiary of Peru in Washington have been instructed and specially authorized to pledge, and do hereby pledge, the National Faith of Peru towards the faithful performance and observance of the conditions under which this Certificate has been issued as above set forth.

Therefore, since Peru pledged its "National Faith" to the payment of each bond, the 20-year statute of limitations applies to Plaintiff's action on these bonds.  Furthermore, in *White v. Wells Fargo Advisors, et al.,* 2014 N.Y. Misc. LEXIS 3171, at *14 (Supreme Court of New York, NY County 2014), a case involving bearer bonds, as here, the Court held: "Contrary to defendants' argument, it would appear that the twenty-year limitations period provided by CPLR 211(a) is applicable to this action which seeks 'to recover … interest upon a written instrument evidencing an indebtedness on the state of New York or any person, association, public or private corporation .. secured only by the full faith and credit of the issuer."  Thus, under *White,* the 20-year statute of

limitations applies to Plaintiff's action to collect on the (bearer) bonds. *See also Kupfer,* 2010 U.S. Dist. LEXIS 145454, at *5-6.

In addition, when applying the 20-year statute of limitations, it is proper to equitably toll the statute during the time when Plaintiff was not able to bring its cause of action against Peru. *See Oswego & Syracuse R. Co. v. State,* 226 N.Y. 351, 124 N.E. 8 (N.Y. 1919) (statute of "limitations are suspended when there is no tribunal competent to adjudge.").  Plaintiff was not able to bring its action against Peru until 2004, when the U.S. Supreme Court issued its decision in *The Republic of Austria v. Altmann*, 541 U.S. 677 700 (2004).  There, the Supreme Court held – for the first time -- that the FSIA applies to conduct that occurred prior to its enactment: "...applying the FSIA to all pending cases regardless of when the underlying conduct occurred is most consistent with two of the Act's principal purposes: clarifying the rules that judges should apply in resolving sovereign immunity claims and eliminating political participation in the resolution of such claims." *Id.* at 699.[11]  Prior to *Altman,* the FSIA had not been applied retroactively, as numerous courts in this Circuit had held. *See, e.g., Marks v. USSR,* 841 F.2d 26 (2d Cir. 1988).  In *Marks*, the Second Circuit held that neither the FSIA nor the Tate Letter applied retroactively:

> We agree with the district court that although the issuance of public debt falls within the 'commercial activity' exception of §1605(a)(2) of the FSIA...the federal courts have no jurisdiction over these suits.  The district court found that the Act is inapplicable to claims arising before the State Department issued the 'Tate Letter' in 1952, adopting the 'restrictive theory' of sovereign immunity that excluded nonpublic and commercial activities...Such a retroactive application of the FSIA would affect adversely the USSR's settled expectation, rising 'to the level of an antecedent right' of immunity from suit in American courts...We believe … that 'only after 1952 was it reasonable for a foreign sovereign to anticipate being sued in the United States courts on commercial transactions.

---

[11] The Court also stated: "Quite obviously, Congress' purposes in enacting such a comprehensive jurisdictional scheme would be frustrated if, in post-enactment cases concerning pre-enactment conduct, courts were to continue to follow the same ambiguous and politically charged 'standards' that the FSIA replaced." *Id.* at 699.

*Id.* at 27.[12]   Thus, since the decision in *Altman* held for the first time that the FSIA applied

retroactively, Plaintiff could not have brought an action on the bonds against Peru under the FSIA,

prior to *Altmann*.   Therefore, Plaintiff's action here is timely because it filed its action within 20

years of the date of the *Altmann* decision (2004).

## V.   THE COMPLAINT IS NOT BARRED BY COLLATERAL ESTOPPEL.

There can be no collateral estoppel effect of the Franco-Chilean Award because, as

demonstrated above, the Arbitration was limited in scope to the determination of which

debtholders of Peru would participate in the funds deposited by Chile with the Bank of England.

In addition, Peru argued strenuously and the Arbitral Tribunal agreed that the Award would have

no effect on any other or subsequent action by a debtholder against Peru, and could not be used in

any such action, and made this holding specifically with regard to potential res judicata (collateral

estoppel) effects.   Therefore, the Award can have no collateral estoppel effect in this case.

Moreover, if there was any collateral estoppel effect, it would benefit the Plaintiff because

the Arbitral Tribunal determined that the bonds were issued, they were issued in New York, they

had not been paid or cancelled, and, as of 1901, they continued to be outstanding. Franco-Chilean

Award, pp. 337-38.   Therefore, Peru's collateral estoppel argument should be rejected.

## VI.   THE COMPLAINT IS NOT BARRED BY THE ACT OF STATE DOCTRINE.

Peru argues that the complaint is barred by the Act of State Doctrine because (1) the bonds

were not issued in New York, but are internal debt, and (2) Peru passed Law No. 8599

---

[12] *See also Oliner v. Czechoslaviak Socialist Republic*, 715 F. Supp. 1228, 1230 (S.D.N.Y. 1989) ("In any event, the bonds were issued well before an exception for commercial activities was recognized by the United States or under international law generally.  Indeed, the Court of Appeals for the Second Circuit has held that the FSIA is inapplicable to claims arising before the United States State Department issued the 'Tate Letter' in 1952, adopting the 'restrictive theory of sovereign immunity' that excluded nonpublic and commercial activities...Because the operative events at issue occurred before 1952, neither the FSIA nor the 'Tate Letter' applies retroactively to confer jurisdiction over this action.") (citing *Marks*).

extinguishing all unpaid internal debt.  However, as noted above, the Franco-Chilean Award held

that the bonds were issued in New York, as is also clear from the face of the bonds.  Therefore,

Peru's passage of Law No. 8599 is ineffectual to extinguish its external debt.

A foreign sovereign's attempt to transform its actions from "commercial" into an "act of

state" by passing legislation to prevent payment on its external debt has been repeatedly rejected

by this Circuit's courts.  In *Lightwater v. Argentina,* 2003 U.S. Dist. LEXIS 6156 at *12-13

(S.D.N.Y. 2003), the Court rejected Argentina's argument that its moratorium on debt payments

constituted an "act of state," holding that, because the act of state doctrine only applies to actions

within a nation's own territory and bond obligations have their situs where the bond holders are

located, "[a]n act of a nation in failing to make payments on bonds held in other countries, does

not constitute an act of state dealing with property located within the nation." *Id.*

In *Allied Bank Int'l v. Costa Rica,* 757 F.2d 516 (2d Cir. 1985), the Second Circuit held

that Costa Rica's directives suspending all debt repayment were not protected under the doctrine:

"The act of state doctrine is applicable to this dispute only if, when the decrees were promulgated,

the situs of the debt was in Costa Rica.  Because we conclude that the situs of the debt was in the

United States, the doctrine is not applicable." *Id.* at 521-22.  Finally, the Court concluded:

> [a]cts of foreign governments purporting to have extraterritorial effect--and consequently,
> by definition, falling outside the scope of the act of state doctrine--should be recognized
> by the courts only if they are consistent with the laws and policy of the United States.
> The Costa Rican government's unilateral attempt to repudiate private, commercial
> obligations is inconsistent with the orderly resolution of international debt problems.  It is
> similarly contrary to the interests of the United States, a major source of private
> international credit...Recognition of the Costa Rican directives in this context would also
> be counter to principles of contract law...If we were to give effect to the directives, our
> decision would vitiate an express provision of the contracts between the parties.

*Id.*  Therefore, Peru's act of state doctrine argument should be rejected.

## VII.    <u>CONCLUSION.</u>

For the reasons stated above, this Court should deny Peru's Motion to Dismiss.


June 3, 2016                                    Respectfully Submitted,



                                               _____
                                               Patrick J. Ahern
                                               Edith Rasmussen
                                               Ahern & Associates, P.C.
                                               Willoughby Tower
                                               8 South Michigan Avenue
                                               Suite 3600
                                               Chicago, Illinois 60603
                                               (312) 404-3760
                                               patrick.ahern@ahernandassociatespc.com