UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MMA Consultants 1, Inc.,

              Plaintiff,

   v.

The Republic of Peru,

              Defendant.

No. 15-cv-5551

---

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE REPUBLIC OF PERU'S MOTION TO DISMISS THE COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ................................................................................................................................. 2

    1.       MMA Cannot Deny That the Peru-GCC Award Resolved All Disputes Between Peru and GCC and Made Binding Findings of Fact. ............................................... 2

    2.       MMA Cannot Deny That There Is No Plausible Basis For Asserting That the Certificates Were Ever Validly Issued in the United States. .................................. 4

    3.       The Certificates Were Due And Payable As of 1880 And MMA Has Not Pled Any Facts Demonstrating That the Certificates Were Payable on Demand Or That the 20 Year Demand Statute Applies............................................................................ 6

CONCLUSION ............................................................................................................................ 10

## **TABLE OF AUTHORITIES**

### **CASES**

Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516 (2d Cir. 1985) .................................................................................................................4

Benjamin v. Traffic Exec. Ass'n E. R.Rs., 869 F.2d 107 (2d Cir. 1989) .......................3

Carl Marks & Co. v. Union of Soviet Socialist Republics, 841 F.2d 26 (2d Cir. 1988) .................................................................................................................9

Charles Schwab & Co. v. Retrophin, Inc., 2015 U.S. Dist. LEXIS 133535 (S.D.N.Y. Sept. 30, 2015) ..................................................................................4

Chen Jie Shan v. Citibank, N.A., 2007 U.S. Dist. LEXIS 58875 (S.D.N.Y. Aug. 10, 2007)……………………………………………………………………..8

Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc., 810 F.3d 861 (2d Cir. 2015) ........9

Fairview v. Norris, 234 F.2d 199 (10th Cir. 1956)……………………………………..8

In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493 (S.D.N.Y. 2009) .........................5

Kubil v. Rosetti, 34 N.Y.2d 68, 312 N.E.2d 167 (1974)……………………..…………..8

Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275 (2d Cir. 2000) ....................................3

Morgan v. U.S., 113 U.S. 476 (1885) ..............................................................................9

Morris v. People's Republic of China, 478 F. Supp. 2d 561 (S.D.N.Y. 2007).............10

Munno v. Town of Orangetown, 391 F. Supp. 2d 263 (S.D.N.Y. 2005).........................5

Purjes v. Plausteiner, No. 15-CV-2515 (VEC), 2016 U.S. Dist. LEXIS 16345 (S.D.N.Y. Feb. 10, 2016) ................................................................................3

Republic of Austria v. Altmann, 541 U.S. 677 (2004) ...................................................9

Robinson v. Gov't of Malay., 269 F.3d 133 (2d Cir. 2001) ............................................5

Rogers v. Petroleo Brasiliero, 673 F.3d 131 (2d Cir. 2012) .......................................5, 8

Rogers v. Petroleo Brasiliero, S.A., 741 F. Supp. 2d 492 (S.D.N.Y. 2010) ..................8

Shapiro v. Republic of Bolivia, 930 F.2d 1013 (2d Cir. 1991) ......................................5

Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422 (2007).......................1

Skanga Energy & Marine Ltd. v. Petroleos De Venez S.A., 522 F. App'x 88 (2d Cir. 2013) ..................................................................................................................5

Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36 (N.Y. 1995) ............................................9

Wheeler v. Warner, 47 N.Y. 519 (N.Y. 1872) .................................................................................9

**STATUTES AND RULES**

C.P.L.R. § 206(a) ...........................................................................................................................9

C.P.L.R. § 206(a)(2) .......................................................................................................................8

C.P.L.R. § 211(a) .....................................................................................................................9, 10

C.P.L.R. § 213 ................................................................................................................................9

C.P.L.R. § 213(2) ...........................................................................................................................7

Peru's Law No. 8599 .....................................................................................................................7

Rule 11 ...........................................................................................................................................1

Rule 12(b)(6) ..................................................................................................................................8

Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ...............................................................1

Peru submits this reply memorandum of law in further support of its motion to dismiss (the "Motion") the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

## PRELIMINARY STATEMENT

MMA's attempt to revive the Certificates at issue in this case boils down to three assertions, none of which have a good faith basis in fact or law, such that dismissal is mandated:

- MMA argues that the Peru-GCC Arbitral Award is not entitled to *res judicata* effect because its scope was limited. Opp'n at 3-5, 24. But Peru did not argue this. What Peru showed, and what MMA ignores, is that the Peru-GCC Award had collateral estoppel effect – which is different from *res judicata*. The Tribunal made clear that the Peru-GCC dispute was within the scope of its jurisdiction, and the Award, as well as historical evidence, have then established that the Certificates (i) were never validly issued in New York; and (ii) never left GCC's possession until *after* they were due and callable *by their express terms*.

- MMA argues that the Certificates were issued in New York because they were "issued" and on their face say that this was in New York. Opp'n at 6. But this ignores that the Peru-GCC Award established that the Certificates only were issued to GCC in Peru, and publicly available historical evidence confirms that GCC *never* validly issued the Certificates in New York. Indeed, MMA now concedes that there never were newspaper advertisements of redemption notices, see Opp'n at 21, even though the Certificates required those notices. As such, there is no plausible basis for MMA to assert that Peru ever acted in New York as to the Certificates.

- MMA argues that the Certificates should be treated like bonds that are due upon demand and have no due date – and that it had 20 years from demand to make its claim. Opp'n at 19-24. But, remarkably, this argument ignores the *express terms* of the Certificates (on which MMA claims to rely) *and* of New York law regarding the 20-year claim period. The Certificates on their face had to be called between 1875 and 1880, as of which time they were due and payable (and stated that all interest stopped). Moreover, for bearer bonds to be subject to the 20-year demand rule, New York law requires that they be offered in New York by an advertised offering. MMA has conceded that there were no advertisements as to the Certificates. Opp'n at 21. Thus, any default occurred in 1880, and was subject to a six-year limitations period.[2]

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the Motion, including: Defendant The Republic of Peru ("Defendant" or "Peru"); Complaint ("Compl."); Plaintiff MMA Consultants 1, Inc. ("MMA"); Certifications of Indebtedness (the "Certificates"); Arbitration Tribunal ("Tribunal"); and International arbitration decision of 1901 ("Peru-GCC Award"). Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss is referred to herein as the "Opposition" or "Opp'n".

[2] This Court may dispose of the Complaint on any of the grounds provided; it need not make findings on all issues. Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 425 (2007). Peru did send MMA's counsel a Rule 11 letter (Opp'n at 7, n.6) as a result of these unassailable points and MMA's papers demonstrate that the Rule 11 letter was appropriate.

# ARGUMENT

### 1. MMA Cannot Deny That the Peru-GCC Award Resolved All Disputes Between Peru and GCC and Made Binding Findings of Fact.

MMA asserts that collateral estoppel does not apply here because the scope of the arbitration was limited and the Peru-GCC Award was not intended to have *res judicata* effect. Opp'n at 4, 24. However, MMA offers no case law to show that either argument bars the preclusive effect of the issues decided by the Tribunal. Furthermore, MMA misinterprets the Peru-GCC Award and the issues decided by the Tribunal, which necessarily results in MMA's claim failing as a matter of law.

MMA asserts that the Peru-GCC Award should not have collateral estoppel effect because the arbitration was limited in scope. Opp'n at 24. But MMA offers no authority to support the idea that the Tribunal's articulation of the scope of its decision affects whether collateral estoppel applies when the elements of collateral estoppel are met, as they are here.[3] Furthermore, MMA cannot deny that the issues decided by the Tribunal concerning the Certificates were squarely within the scope of "determining who the parties with a rightful claim are to the amount deposited in the Bank of England and to dividing up said amount among them." See Opp'n at 3 (quoting Peru-GCC Award at 79). Thus, Peru has shown that, determining whether the Certificates were validly issued in New York, whether they had been effectively redeemed, and when redemption took place were core issues that the Tribunal had to decide in order to determine whether GCC, as a purported creditor to Peru had a right to receive any money set aside at the Bank of England to pay awards from the Arbitration. Motion at 16-20.

---

[3] MMA does not deny that the arbitration occurred and does not refute that the elements of collateral estoppel are met, as established in Peru's Motion. See Motion at 16-20; Opp'n at 24.

MMA also focuses on *res judicata* in arguing that the Peru-GCC Award does not preclude MMA's claim. Opp'n at 24. But again, this is irrelevant. MMA misconstrues Peru's argument. Peru has argued that collateral estoppel – not *res judicata* – applies to bar MMA's claim because it prevents MMA from asserting that the Certificates ever were issued to the public in New York. Motion at 15-20. Although related, *res judicata* and collateral estoppel are distinct legal doctrines with different elements and different purposes. *Res judicata* stands for the principle that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Monahan v. N.Y.C. Dep't of Corr., 214 F.3d 275, 284 (2d Cir. 2000). "This is separate from the related doctrine of collateral estoppel, or issue preclusion, which 'bars a party from relitigating in a second proceeding an issue of fact or law.'" Id. at 284, n.5. Collateral estoppel centers on whether **issues** were previously decided, regardless of the legal claims, and applies so long as the elements of collateral estoppel have been met. Thus, "invoking collateral estoppel in a given case may be permissible when invoking res judicata is not." Benjamin v. Traffic Exec. Ass'n E. R.Rs., 869 F.2d 107, 112 (2d Cir. 1989). MMA has offered no basis for denying collateral estoppel to the issues decided in the Peru-GCC Award, which established that the Certificates were never validly issued to the public in New York and were in fact repaid by Peru in Peru.[4] See Motion at 15-20.[5]

---

[4] Although MMA cites block quotes from the Award to support its *res judicata* argument, these quotes only note *res judicata* as limiting the preclusive effect of the Peru-GCC Award to claims **within the scope of the Arbitration**. See Opp'n at 4 (the *res judicata* effect of the Award was limited to the "technicality of its ruling," such that the Tribunal would not "rule on other claims made against the Government[] of Peru," and that the "ruling must be limited to determining the claimants who are entitled to the deposit in London and to what extent they are so entitled. And the Ruling will have effects of res judicata only within these limits.") (quoting Peru-GCC Award at 91-92, 97). Nothing about this limits collateral estoppel, nor did Peru's requesting that the Tribunal's "jurisdiction" be limited so as not to "determine the claimants[']" rights beyond those specifically enumerated. Opp'n at 4 (quoting Peru-GCC Award at 100). As shown above, the Arbitral findings about the Certificates were within the scope of the Arbitration. See Motion at 16-20.

[5] MMA cannot deny that courts routinely take notice of arbitral findings. Purjes v. Plausteiner, No. 15-CV-2515 (VEC), 2016 U.S. Dist. LEXIS 16345, at *13-14 (S.D.N.Y. Feb. 10, 2016) (taking notice of record in arbitration

### 2. MMA Cannot Deny That There Is No Plausible Basis For Asserting That the Certificates Were Ever Validly Issued in the United States.

Relying only on the face of the Certificates, MMA asserts that "the Bonds were issued in New York City." Opp'n at 1. However, this pleads nothing because the findings in the Peru-GCC Award and the absence of any public advertisements about the Certificates—which MMA now concedes—shows that the Certificates were not validly issued in New York. Rather, as the Award showed, the Certificates were internal Peruvian debt, they were effectively redeemed through Peru's scheduled payments to GCC in Peru, and the Tribunal never held that GCC had a continuing right to sell the Certificates.[6] See Motion at 8, 18-20; Peru-GCC Award at 318, 337-38, 385-87. Thus, the Peru-GCC Award supports dismissing MMA's breach of contract claim.

MMA argues that "[t]he Arbitral Tribunal made it clear that the bonds were issued, and they were issued in New York City." Opp'n at 8. But, the Tribunal *never* made this finding. To the contrary, the Tribunal said that the Certificates were delivered to GCC in Peru and never left GCC's possession. Peru-GCC Award at 337-38. The Tribunal's finding is confirmed by the Lide Declaration, which establishes that no advertisements ever were published in New York about the Certificates. See Lide Decl. ¶¶ 10-17. This is crucial because the Certificates expressly required that advertisements as to mandatory annual redemptions be published in New York newspapers *and* MMA now concedes that there were never any advertisements. Opp'n at

---

proceeding); Charles Schwab & Co. v. Retrophin, Inc., 2015 U.S. Dist. LEXIS 133535, at *18-21 (S.D.N.Y. Sept. 30, 2015) (taking notice of an arbitral award in order to determine whether it had preclusive effect).

[6] MMA's assertion that the Act of State doctrine is inapplicable is premised on a loan actually being made in New York and not repaid here. Opp'n at 24-25. That is what Allied Bank Int'l v. Banco Credito Agricola de Cartago stands for. 757 F.2d 516, 521-22 (2d Cir. 1985). Here, MMA cannot plead that. To the contrary, the Peru-GCC Award found that the Certificates were issued to and held by GCC in Peru, and repaid there as internal Peruvian debt. Peru-GCC Award at 158, 318, 337-38. Accordingly, the Act of State doctrine does apply here given Peru's later cancellation of any remaining Peru-GCC debt.

21. Thus, MMA cannot rely on the face of the Certificates to meet its burden of showing that the Certificates were issued in New York. Peru-GCC Award at 158, 337-38; Motion at 6-7.[7]

MMA also argues that the Tribunal held that "[t]he 1866 bonds . . . were issued in New York," and that "the same applies to the 3,600 1875 certificates." Opp'n at 8 (quoting Peru-GCC Award at 164). But MMA fails to inform the Court that this is not actually the Tribunal's holding. Rather, it is a quote from a section of the Peru-GCC Award in which *GCC's* arguments are summarized. See Peru-GCC Award at 163 (applicable subheading states: "In its Second Pleading, Pgs. 5-36, the Consignee Company submitted the following against the exception"); id. at 164 (paragraph quoted begins with "The Corporation argues . . ."). As shown above, in fact the Award and publicly available information establish that the Certificates never were validly issued in New York, and hence, MMA has in no way met its burden to plead facts establishing commercial activity with respect to the Certificates,[8] and thus there is no basis for jurisdiction over Peru under the FSIA.[9] See Motion at 9-12.

---

[7] MMA relies in part on the Tribunal's statement that "the certificates were undoubtedly issued by the Government of Peru to the Company." Opp'n at 8 (quoting Peru-GCC Award at 337). But issuing the Certificates *to GCC* was not an issuance in New York, and in no way complied with the other terms of the Certificates (i.e., regarding advertisements of redemptions). See Transcription and Contract, Soderberg Decl. Exs. A & C. MMA then ignores the Tribunal's finding that, after Peru delivered the Certificates to GCC, GCC "kept the Certificates for itself. [GCC] credited the Government first for the total amount, and then debited it successively, at each due date, the amount of depreciation that should have taken place, and the interest." Peru-GCC Award at 158.

[8] MMA has the burden of pleading facts showing that immunity has been lost. See Robinson v. Gov't of Malay., 269 F.3d 133, 141 (2d Cir. 2001). Given the Peru-GCC Award and publicly available information in the Lide Declaration, MMA cannot rely on the face of the Certificates alone. Contrary to Skanga Energy & Marine Ltd. v. Petroleos De Venez S.A., 522 F. App'x 88 (2d Cir. 2013), where the defendant failed to submit any evidence, Peru has provided ample evidence to show that there was no U.S. commercial activity relating to the Certificates. In assessing FSIA jurisdiction, the Court may consider the Peru-GCC Award and Lide Declaration. See Robinson, 269 F.3d at 140-41 (noting that it would be error not to look beyond the pleadings to factual submissions, including affidavits, to determine whether there was sufficient commercial activity to support FSIA jurisdiction); In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 504 (S.D.N.Y. 2009) (taking judicial notice of declaration attaching Congressional hearing testimony); Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) (taking judicial notice of "affidavits and/or pleadings submitted by plaintiff and letters written by plaintiff's counsel" which were part of the public record). MMA offers no basis for not considering the information offered here.

[9] Cases cited by MMA (Opp'n at 13-19) are cases in which it could be factually pled that there was commercial activity in New York. Compare Shapiro v. Republic of Bolivia, 930 F.2d 1013 (2d Cir. 1991) (bonds were sent to the United States and issued to a United States company) with Rogers v. Petroleo Brasiliero, 673 F.3d 131, 139 (2d Cir. 2012) (no direct effect when there was no obligation that payment be made in the United States). MMA does

MMA also argues that the Certificates were not redeemed or cancelled, and that GCC had a continuing right to sell them. Opp'n at 9-12. But MMA ignores that the Tribunal made a factual finding that every year from 1876 to 1880, the Certificates *were* debited and credited between GCC and Peru, effectively redeeming the Certificates. See Peru-GCC Award at 337. MMA further disregards the prior history and complex dealings between GCC and Peru, which were *all* at issue in the Arbitration. GCC's estate, through the arbitration process, was trying to account for a variety of claims relating not only to the Certificates, but to other bond issuances and other debts. The Certificates represented only a fraction of what GCC litigated. Even though the Tribunal found, based on *all* of GCC's dealings with Peru, that GCC had a right to draw on the fund established at the Bank of England with respect to the Arbitration, this does not save the claim here because the Peru-GCC Award established that the Certificate debt was paid,[10] and that GCC had no continuing right to sell the Certificates.[11]

3. **The Certificates Were Due And Payable As of 1880 And MMA Has Not Pled Any Facts Demonstrating That the Certificates Were Payable on Demand Or That the 20 Year Demand Statute Applies.**

MMA argues that the statute of limitations did not begin to run until a demand for payment was made in 2015. Opp'n at 20. But, in arguing against the six-year statute of

---

not cite a single case that stands for the proposition that because bonds allow issuance in the United States, without more, this constitutes United States commercial activity.

[10] That Peru's debt to GCC was considered paid and canceled also was confirmed in 1907, when Peru's Ministry of Treasury and Commerce reported to Peru's Congress on the Award as "definitive cancellation of any remaining contractual debt once GCC turned over all 3,600 Certificates." Soderberg Decl. Ex. E. Nothing about this report was a request for payment, as MMA suggests (Opp'n at 6, n.5).

[11] See Motion at 5. Contrary to MMA's argument, the Tribunal never held that "GCC was free to sell the certificates to another bearer" after the redemption date had passed. See Opp'n at 11. Rather, the Tribunal "consider[ed] the possible consequences of an alienation of the certificates by the Company" to determine whether, as a result of a *prior* alienation, GCC's claim "would have been definitively extinguished," i.e., this was about the consequences of a hypothetical *past*—not present or future—alienation. See Opp'n at 11 (quoting Peru-GCC Award at 338) (emphasis added). The Tribunal also found that, because GCC's total claim had not been extinguished, "the applicant currently has grounds to assert it with all the incidental and guaranteed rights that were attached thereto." Peru-GCC Award at 338. Far from permission to resell the now-defunct Certificates (as of 1901), this was about allowing GCC to proceed in the Arbitration to litigate its remaining claim.

limitations period in N.Y. C.P.L.R. § 213(2), MMA is compelled to ignore the express terms of the Certificates that it relied upon elsewhere. Opp'n at 6, 14, 21.[12]

The express terms of the Certificates state that the last of the Certificates would have been called and redeemed in 1880 (when interest stopped running). See Transcription, Soderberg Decl. Ex. C (providing that the principal shall be paid beginning in May 1876 through May 1880). After issued Certificate numbers were drawn by lot in New York, those Certificate numbers were to be published in newspapers announcing redemption, and the Certificates *required* "the corresponding Certificates [to] be *redeemed* on the 1st day of May then next ensuing and such Certificates shall accordingly be *paid* on and after said 1st of May in the respective years." Id. (emphasis added). As such, Peru consistently treated the Certificates as debt extinguished long ago under Peruvian law.[13]

MMA also must concede that there is a difference between bearer bonds with set maturity dates, and bearer bonds with no fixed payment date which are payable only upon demand.

---

[12] Thus, relying on the terms of the Certificates, MMA argues that "the drawings to determine which bonds were to be paid were to occur in New York City and the notices as to the drawings were to be placed in two New York morning dailies, clearly showing the local effect of the bond placement." Opp'n at 14, 18. Contradicting this, MMA then acknowledges that "a holder of a bond could not present and collect the bond on the dates set forth on the bond, because Peru had to call the bonds for payment (by providing notice of the drawings) . . . that did not happen." Opp'n at 21.

[13] MMA argues, in part, that "not until February 3, 2012, when Peru published a notice in *El Peruano*, did Peru identify the 1875 bonds specifically and indicate that it would not pay them, once again invoking Law No. 8599." Opp'n at 20-21. In support, MMA cites an uncertified translation of the February 3, 2012 notice. Opp'n at 4; Ahern Decl. Ex. 4. ("the Ministry of Finance and Economics does accept admit any requests for payment of bonds issued by the Republic of Peru."). Remarkably, an accurate and certified translation totally contradicts MMA's argument. The notice actually states "the Ministry of the Economy and Finance *shall no longer allow any demand for payment on Bonds issued by the Republic of Peru that have either expired or the statute of limitations has lapsed on collection*, in accordance with Law No. 8599. . . and as a result we suggest that the public in general refrains from conducting transactions or dealings with these instruments." Exhibit A to the Supplemental Declaration of Vanessa Soderberg ("Soderberg Supp. Decl.") (emphasis added). MMA also cannot show that this 2012 notice was the earliest public notice about the Certificates. To the contrary, notices in *El Peruano* communicating that the Certificates were worthless were published as early as April 28, 2003. Soderberg Supp. Decl. Ex. B ("[i]ndividuals and legal entities are advised to abstain from conducting transactions with alleged holders or owners of purported bonds that had been issued by the Peruvian Government, some of which are very old, such as those from . . . 1875 . . . which have either expired or their statute of limitations has lapsed, in accordance with Law. No. 8599"). In fact, MMA was on notice that the Certificates were not validly issued, were paid, and were not redeemable from earlier publicly available sources including, but not limited to, the Peru-GCC Award, Peru's 1907 Congressional announcement, and Peru's Law No. 8599. See Motion at 21; Soderberg Decl. Exs. A, E, F; see also Lide Decl.

7

Opp'n at 20.  Indeed, MMA's primary case, Rogers v. Petroleo Brasiliero, S.A., 741 F. Supp. 2d 492 (S.D.N.Y. 2010), shows why the Certificates are not bearer demand bonds.  Here, as in Rogers, the Certificates have extremely well-defined terms.  The express terms of the Certificates limit them in time, and recite that the Certificates mature and payment could be demanded as of 1880 (by which time all the Certificates were to have been redeemed).  In Rogers, the district court denied a Rule 12(b)(6) motion for lack of subject matter jurisdiction and only mentioned the timeliness of plaintiff's complaint in the footnote relied on by MMA.  See Opp'n at 20 (citing Rogers, 741 F. Supp. 2d at 510 n.12).  But, MMA misleads this Court by ignoring that Rogers expressly endorses the argument Peru makes here (Motion at 12-14).  Expressing "grave concerns regarding the merits of the complaint," the Second Circuit stated that the terms and conditions on the face of the bonds state that Petrobras owes the value to holders "up to [the Bonds'] redemption" dates that were stated on the face of the bonds.  See Rogers, 673 F.3d at 137.  Thus, an obligation only existed through the stated redemption period and after expiration of that redemption period, "the Bonds no longer had a residual benefit," there was no longer a current obligation, and failure to convert the bonds was not a breach of any contractual right.  Id.  On that basis, the Second Circuit could have dismissed the case.[14]

---

[14] MMA's remaining cases are inapposite. See Opp'n at 19-21 (citing Kubil v. Rosetti, 34 N.Y.2d 68, 312 N.E.2d 167 (1974) (interpreting Personal Property Law and determining whether a bond is an "instrument" or "property" for the purposes of a statute; the point of counsel relied upon by MMA is a stray proposition from the respondent's submissions that (i) was not addressed by the court in its judgment, and (ii) was at any rate based on counsel's own erroneous reading of Morgan, discussed next); Morgan v. United States, 113 U.S. 476, 499 (1885) (determining whether bonds in controversy were overdue at the time of purchase by those who claimed title; construing the contract contained in the bond, the court distinguished a bond payable on demand after maturity of a call for redemption but not overdue until the fixed date for final payment (i.e. not yet unconditionally payable), from an overdue bond where the fixed date for final payment had passed (i.e. unconditionally payable), and held that the bonds in question, which on their terms were "callable," were not overdue until after the limit fixed for final payment had passed); Fairview v. Norris, 234 F.2d 199 (10th Cir. 1956) (distinguishing cases involving a trust fund where a bond has a maturity date but "that is not a due date in the sense that the bond can be presented and collected at that date.  It can only be paid if there are funds available at that time."); Chen Jie Shan v. Citibank, N.A., No. 06-cv-5095 (PAC), 2007 U.S. Dist. LEXIS 58875 (S.D.N.Y. Aug. 10, 2007) (determining the statute of limitations on plaintiff's claim for $500,000,000 demonstrated by etchings on a steel box and stating that N.Y. C.P.L.R. §206(a)(2) "begins to run when demand for prepayment or return of the money is made.")).

By their express terms, the Certificates all had matured by 1880 and the statute of limitations began to run on the day after maturity to the extent there was default on payment. See Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 43 (N.Y. 1995).  When the Certificate holders failed to demand payment by January 1, 1887, six years after the Certificates matured and holders had a right to demand payment, any claims under the Certificates were time-barred.  Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc., 810 F.3d 861, 865 (2d Cir. 2015); N.Y. C.P.L.R. § 206(a).  When MMA purchased its Certificates, likely in the collectables market, it obtained only the rights of its seller.  Morgan, 113 U.S. at 499; Wheeler v. Warner, 47 N.Y. 519 (N.Y. 1872).  As the Certificates were overdue on their face and any claim for payment was time-barred for the previous holder, MMA's claim is similarly time-barred.[15]

MMA also cannot argue that the Certificates are subject to a 20-year limitations period under N.Y. C.P.L.R. § 213.[16]  MMA relies on N.Y. C.P.L.R. § 211(a), but ***ignores*** the statutory requirement that a bond must have been "originally sold by the issuer after publication of an advertisement for bids for the issue in a newspaper of general circulation."  Id.  Thus, the 20-year statute of limitations cannot apply to the Certificates because MMA has not pled that there were any advertisements soliciting bids for the Certificates published in any newspaper of general circulation between 1875 and 1890.  In fact, to the contrary, Peru has established that there were none.  Lide Decl. ¶¶ 10-17.  Indeed, MMA even concedes that no public notices or

---

[15] The statute of limitations does not reset simply because the Certificates subsequently were acquired by new holders.  Moreover, MMA ignores demands made in 2009 by a previous holder on 13 of the 14 Certificates at issue.  Soderberg Decl. Ex. H.  Given these demands, MMA's claim is time-barred under its own argument that with respect to a bearer bond, injury occurs and an action accrues when demand for payment is made and that demand is rejected.  Based on this previous demand, claims on the Certificates were time-barred by January 2015 at the latest, six months before its Complaint.

[16] MMA argues that the 20-year statute of limitations should be equitably tolled because it could not bring a cause of action against Peru until 2004, "when the U.S. Supreme Court held – for the first time – that the FSIA applies to conduct that occurred prior to its enactment." Opp'n at 23.  However, prior to Republic of Austria v. Altmann, 541 U.S. 677 (2004), with respect to commercial activity, the FSIA was routinely applied retroactively to 1952.  See, e.g., Carl Marks & Co. v. Union of Soviet Socialist Republics, 841 F.2d 26, 27 (2d Cir. 1988).

9

advertisements were placed in newspapers. Opp'n at 21. Hence, MMA has no good faith basis to argue that the 20-year limitations period under N.Y. C.P.L.R. § 211(a) applies.[17]

Accordingly, even if the Certificates had been validly issued in New York in 1875, MMA would as a matter of law have no right to claim on the Certificates now.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Complaint be dismissed in its entirety and with prejudice.

Dated: July 5, 2016
New York, New York

WHITE & CASE LLP

By: /s/ *Owen C. Pell*

Owen C. Pell
Jonathan C. Hamilton
Vanessa Soderberg
Evelyn A. Fanneron
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8891
opell@whitecase.com
jhamilton@whitecase.com

*Attorneys for Defendant*
*The Republic of Peru*

---

[17] N.Y. C.P.L.R. § 211(a) is also not applicable here because the Certificates were secured by more than just Peru's full faith and credit. In Morris v. People's Republic of China, 478 F. Supp. 2d 561, 571 n. 15 (S.D.N.Y. 2007), this Court held that the 20-year limitations period did not apply to certain Chinese bonds even though the Chinese government "pledge[d] its good faith and credit" because "the entire loan was also secured 'upon the entire revenues of the Salt Administration of China' and 'certain Central Government taxes of the [specified] Provinces.'". Here, beyond Peru's "National Faith," the Certificates were "secured" by the same Guano Guarantee that secured the payment of the original debt running from Peru to GCC. See Soderberg Decl. Ex. C.